**NOT YET SCHEDULED FOR ORAL ARGUMENT**

**No. 15-1080**

# In the United States Court of Appeals
# for the District of Columbia Circuit

————————————————

NEUSTAR, INC.,
PETITIONER

*v.*

FEDERAL COMMUNICATIONS COMMISSION
AND UNITED STATES OF AMERICA,
RESPONDENTS

AND

CTIA–THE WIRELESS ASSOCIATION, ET AL.,
INTERVENORS

————————————————

*ON PETITION FOR REVIEW OF AN ORDER*
*OF THE FEDERAL COMMUNICATIONS COMMISSION*
*(WC DOCKET NOS. 07-149 & 09-109; CC DOCKET NO. 95-116)*

————————————————

**BRIEF OF PETITIONER NEUSTAR, INC.**

————————————————

TYRONE BROWN
ANDREW G. MCBRIDE
THOMAS J. NAVIN
BRETT A. SHUMATE
WILEY REIN LLP
  *1776 K Street, N.W.*
  *Washington, DC 20006*
  *(202) 719-7000*

KANNON K. SHANMUGAM
MARCIE R. ZIEGLER
JAMES GILLENWATER
AMY E. MURPHY
WILLIAMS & CONNOLLY LLP
  *725 Twelfth Street, N.W.*
  *Washington, DC 20005*
  *(202) 434-5000*
  *kshanmugam@wc.com*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to Circuit Rule 28(a)(1), counsel for petitioner Neustar, Inc., makes the following certification:

**(A)   Parties, Intervenors, and Amici.**   The parties in this case are petitioner Neustar, Inc., and respondents Federal Communications Commission and United States of America.   The intervenors for respondents are Telcordia Technologies, Inc.; CTIA–The Wireless Association; and United States Telecom Association.   As set forth in the appendix to the order under review, the other persons who appeared before the agency in the proceedings below are:

> Arlington County Office of Emergency Management
> AT&T Services, Inc.
> California Statewide Law Enforcement Association
> CenturyLink
> Cequel Communications, LLC, d/b/a/ Suddenlink Communications
> City of Fairfax Office of Emergency Management
> City of New York Police Department
> Collier County Emergency Services
> Comcast Corp.
> Competitive Carriers Association
> COMPTEL
> Connecticut Department of Public Utility Control
> Cumberland County Emergency Management
> Drug Enforcement Administration
> Fairfield, N.J., Township Office of Emergency Management
> Federal Bureau of Investigation
> Frontier Communications
> HyperCube Telecom, LLC
> Idaho Public Utilities Commission
> Illinois Emergency Management Agency

International Association of Chiefs of Police
Intrado Inc.
Iowa Utilities Board
James Burke
Joe Barasoain
Level 3 Communications, LLC
LNP Alliance
Marlyn S. Bradshaw
Maryland Fire Chiefs Association
Maryland Emergency Management Agency
Massachusetts Department of Telecommunications and Cable
National Association of State Utility Consumer Advocates
National Sheriffs' Association
NENA: The 9-1-1 Association
North American Portability Management, LLC
NTCA–The Rural Broadband Association
Orleans Parish Communication District
PAETEC Communications, Inc.
Public Knowledge
Public Utility Division of the Oklahoma Corporation Commission
Qwest Corporation
Rural Broadband Alliance
Sprint Nextel Corporation
T-Mobile USA, Inc.
TeleCommunication Systems, Inc.
TW Telecom
U.S. Immigration and Customs Enforcement
United States Secret Service
United States TelePacific Corp. d/b/a TelePacific Communications
Vermont Public Service Board
Verizon
WTA–Advocates for Rural Broadband
XO Communications, LLC

**(B)    Ruling Under Review.**  The ruling at issue in this appeal is the
order of the Federal Communications Commission captioned *In the Matters
of Telcordia Technologies, Inc., Petition to Reform Amendment 57 and to*

ii

*Order a Competitive Bidding Process for Number Portability Administra-tion; Petition of Telcordia Technologies, Inc., to Reform or Strike Amend-ment 70, to Institute Competitive Bidding for Number Portability Admin-istration, and to End the NAPM LLC's Interim Role in Number Portability Administration Contract Management; Telephone Number Portability*, WC Docket Nos. 07-149 & 09-109, CC Docket No. 95-116 (released Mar. 27, 2015) (*Order*).  That order is included in the joint appendix.

    **(C)**   **Related Cases.**  Petitioner is unaware of any related case involv-ing substantially the same parties and the same or similar issues.

                                  s/KANNON K. SHANMUGAM
                                  KANNON K. SHANMUGAM

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Circuit Rule 26.1, petitioner Neustar, Inc., states that it is a publicly held company.  Neustar has no parent corporation, and no publicly held company owns 10% or more of its stock.

## STATEMENT REGARDING DEFERRED APPENDIX

Pursuant to Circuit Rule 30(c), the parties have conferred and intend to use a deferred joint appendix.

# TABLE OF CONTENTS

Page

Introduction ................................................................................................1

Statement of jurisdiction ..........................................................................3

Statement of the issues ............................................................................4

Statutes and regulations involved ..........................................................4

Statement of the case ...............................................................................5

    A.    Background ..................................................................................5

        1.    Number portability ......................................................5

        2.    Applicable statutory and regulatory requirements .................6

        3.    The selection of Neustar and its predecessor in interest as Administrator ........................................................10

        4.    The selection of a new Administrator ........................15

    B.    The order under review ..........................................................18

Summary of argument ............................................................................20

Standing ...................................................................................................24

Standard of review ..................................................................................24

Argument .................................................................................................25

I.    The order under review constituted final agency action ........................25

II.    The order must be vacated because Telcordia is not 'impartial' or 'neutral' ...........................................................................................28

    A.    The Commission acted contrary to law and arbitrarily and capriciously by concluding that Ericsson's undisputed alignment with the wireless industry did not disqualify Telcordia....................29

    B.    The Commission acted arbitrarily and capriciously by selecting the affiliate of a telecommunications network equipment manufacturer as Administrator ........................................................38

    C.    The Commission acted arbitrarily and capriciously by disregarding Ericsson's lack of neutrality ..........................................41

Page

Table of contents—continued:

III.  The Commission violated the Administrative Procedure Act by failing to engage in notice-and-comment rulemaking.........................................50

   A.  The Commission's order constituted an exercise in rulemaking......50

   B.  The Commission's failure to engage in notice-and-comment rulemaking was highly prejudicial ......................................................56

IV.  The Commission's evaluation of the competing proposals was arbitrary and capricious............................................................................59

   A.  The Commission's selection was based on its assessment of the costs of the two bids ...............................................................60

   B.  The Commission's assessment of costs was based on an unsupported and erroneous assumption about transition costs.......61

   C.  The Commission provided no reasoned explanation for refusing to consider Neustar's best offer .............................................63

Conclusion...............................................................................................66

# TABLE OF AUTHORITIES*

Page

## CASES

*Alarm Industry Communications Committee* v. *FCC*,
  131 F.3d 1066 (D.C. Cir. 1997)............................................................33

*American Mining Congress* v. *Mine Safety & Health Administration*,
  995 F.2d 1106 (D.C. Cir. 1993).............................................................53

*Anadarko Petroleum Corp.* v. *Panhandle Eastern Corp.*,
  545 A.2d 1171 (Del. 1988) ............................................................31, 32

*AT&T Corp.* v. *Iowa Utilities Board*, 525 U.S. 366 (1999) ...............................51

*Bennett* v. *Spear*, 520 U.S. 154 (1997).................................................26

*Blish* v. *Thompson Automatic Arms Corp.*, 64 A.2d 581 (Del. 1948)..............31

*Bowen* v. *Georgetown University Hospital*, 488 U.S. 204 (1988).....................55

*Burlington Northern & Santa Fe Railway Co.* v. *Surface
  Transportation Board*, 403 F.3d 771 (D.C. Cir. 2005) ...................................43

*Butte County* v. *Hogen*, 613 F.3d 190 (D.C. Cir. 2010).......................................47

*Catholic Health Initiatives Iowa Corp.* v. *Sebelius*,
  718 F.3d 914 (D.C. Cir. 2013)..........................................................56

*Chamber of Commerce* v. *SEC*, 443 F.3d 890 (D.C. Cir. 2006).........................57

*Ciba-Geigy Corp.* v. *EPA*, 801 F.2d 430 (D.C. Cir. 1986).................................27

*City of Arlington* v. *FCC*, 668 F.3d 229 (5th Cir. 2012),
  *aff'd*, 133 S. Ct. 1863 (2013)...........................................................55

*Consolidated Edison Co.* v. *FERC*, 315 F.3d 316 (D.C. Cir. 2003) .................57

---

\* Authorities upon which we chiefly rely are marked with asterisks, pursuant to Circuit Rule 28(a)(2).

Page

Cases—continued:

*Copperweld Corp. v. Independence Tube Corp.,
467 U.S. 752 (1984)........................................................31, 33

Dole Food Co. v. Patrickson, 538 U.S. 468 (2003)........................30

Esmark, Inc. v. NLRB, 887 F.2d 739 (7th Cir. 1989) ....................35

FCC v. Fox Television Stations, Inc., 556 U.S. 502 (2009) ..............25

General Electric Co. v. EPA, 290 F.3d 377 (D.C. Cir. 2002)..........28

Grace Bros. v. Uniholding Corp., No. 17612,
2000 WL 982401 (Del. Ch. July 12, 2000)........................32

Greyhound Lines, Inc. v. United States,
600 F.2d 999 (D.C. Cir. 1979)........................................46

Heartland Regional Medical Center v. Sebelius,
566 F.3d 193 (D.C. Cir. 2009)........................................50

International Brotherhood of Painters & Allied Trades Union
v. George A. Kracher, Inc., 856 F.2d 1546 (D.C. Cir. 1988) ........30

Malone v. Brincat, 722 A.2d 5 (Del. 1998) ..............................48

ManTech Telecommunications & Information Systems Corp.
v. United States, 49 Fed. Cl. 57 (2001) ..............................66

Motor Vehicle Manufacturers Ass'n v. State Farm Mutual
Automobile Insurance Co., 463 U.S. 29 (1983) ..............25, 46, 62

National Environmental Development Ass'n's Clean Air Project
v. EPA, 752 F.3d 999 (D.C. Cir. 2014)............................25, 28

National Telephone Cooperative Ass'n v. FCC,
563 F.3d 536 (D.C. Cir. 2009)..........................................5

Paramount Communications Inc. v. QVC Network Inc.,
637 A.2d 34 (Del. 1994)..................................................48

ix

Page

Cases—continued:

*Perez* v. *Mortgage Bankers Ass'n*, 135 S. Ct. 1199 (2015)................................52

*Public Citizen* v. *Federal Motor Carrier Safety Administration*,
    374 F.3d 1209 (D.C. Cir. 2004)................................................46

*Quadrant Structured Products Co.* v. *Vertin*,
    102 A.3d 155 (Del. Ch. 2014)..............................................31, 32

*Reuters Ltd.* v. *FCC*, 781 F.2d 946 (D.C. Cir. 1986)...........................................27

*Sackett* v. *EPA*, 132 S. Ct. 1367 (2012) ................................................28

*SAI Industries Corp.* v. *United States*, 60 Fed. Cl. 731 (2004) ........................65

*Sebelius* v. *Auburn Regional Medical Center*, 133 S. Ct. 817 (2013) ..............32

*SEC* v. *Chenery Corp.*, 318 U.S. 80 (1943) ....................................25, 36

*Shays* v. *FEC*, 528 F.3d 914 (D.C. Cir. 2008)...........................................24

*\*Sprint Corp.* v. *FCC*, 315 F.3d 369 (D.C. Cir. 2003)................................53, 57

*Sutherland* v. *Sutherland*,
    No. 2399, 2009 WL 857468 (Del. Ch. Mar. 23, 2009)....................................48

*Teleglobe Communications Corp., In re*, 493 F.3d 345 (3d Cir. 2007) ...........49

*\*United States Telecom Ass'n* v. *FCC*, 400 F.3d 29 (D.C. Cir. 2005) ..51, 52, 53

*Verizon* v. *FCC*, 770 F.3d 961 (D.C. Cir. 2014)...................................................55

*VFB LLC* v. *Campbell Soup Co.*, 482 F.3d 624 (3d Cir. 2007)....................32, 49

## STATUTES AND REGULATIONS

*Administrative Procedure Act, Pub. L. No. 79-404,
    60 Stat. 237 (1946)......................................3, 4, 22, 24, 46, 50, 51, 59

Regulatory Flexibility Act, Pub. L. No. 96-354, 94 Stat. 1164 (1980)........23, 58

Page

Statutes and regulations—continued:

Telecommunications Act, Pub. L. No. 104-104,
110 Stat. 56 (1996) ..................... 1, 2, 4, 5, 6, 7, 10, 20, 26, 28, 30, 32, 33, 38, 42

5 U.S.C. § 551(4) ...............................................................................54

5 U.S.C. §§ 603-604 ...........................................................................58

5 U.S.C. § 706(2)(A) ...........................................................................24

28 U.S.C. § 2342(1) ..............................................................................3

47 U.S.C. § 153(2) ..............................................................................10

47 U.S.C. § 153(37) ..............................................................................5

47 U.S.C. § 251 .............................................................................22, 51

47 U.S.C. § 251(b)(2) ...................................................................5, 51, 55

47 U.S.C. § 251(d)(1) ..........................................................................51

47 U.S.C. § 251(e) ..........................................................................51, 52

*47 U.S.C. § 251(e)(1) ...............................7, 26, 28, 30, 32, 36, 51

47 U.S.C. § 303(r) ...............................................................................52

47 U.S.C. § 402(a) .................................................................................3

47 C.F.R. § 52.12(a) ..............................................................................8

*47 C.F.R. § 52.12(a)(1) ................................8, 9, 28, 33, 38, 43

47 C.F.R. § 52.12(a)(1)(i) ...............................................................10, 44

47 C.F.R. § 52.12(a)(1)(ii) ....................................................................44

47 C.F.R. § 52.12(a)(1)(iii) ..............................................................37, 44

Page

Regulations—continued:

*47 C.F.R. § 52.21(k) ..................................................................8, 28, 33, 38, 43

*47 C.F.R. § 52.26(a).....................................................................9, 12, 38, 40, 53

47 C.F.R. § 52.26(b)(2)...........................................................................................12

48 C.F.R. § 15.306(d)(2).........................................................................................65

## MISCELLANEOUS

Administration of the North American Numbering Plan,
    62 Fed. Reg. 55,179 (Oct. 23, 1997) ..................................................52

*Commission Seeks Comment on the North American Numbering
    Council Recommendation of a Vendor To Serve As Local
    Number Portability Administrator*, 29 FCC Rcd. 6013 (2014) ...........18, 56

Harold Furchtgott-Roth, *The Importance of Neutrality in Number
    Portability Administration* (2012) <apps.fcc.gov/ecfs/document/
    view?id=7022013438> .........................................................................8

**In the Matter of Administration of the North American*
    *Numbering Plan*, 11 FCC Rcd. 2588 (1995) ..................6, 7, 8, 32, 36, 37, 42

*In the Matter of Administration of the North American
    Numbering Plan*, 12 FCC Rcd. 23040 (1997).........................................42, 43

*In the Matter of North American Numbering Plan Administration,
    Neustar, Inc., Request to Allow Certain Transactions Without
    Prior Commission Approval and to Transfer Ownership*,
    19 FCC Rcd. 16982 (2004)..................................................................14

*In the Matter of Petition of Telcordia Technologies Inc. to Reform or
    Strike Amendment 70, to Institute Competitive Bidding for
    Number Portability Administration and to End the NAPM LLC's
    Interim Role in Number Portability Administration Contract;
    Telephone Number Portability*, 26 FCC Rcd. 3685 (2011) ......................15

Page

Miscellaneous—continued:

*In the Matter of Petition of Telcordia Technologies Inc. to Reform or Strike Amendment 70, to Institute Competitive Bidding for Number Portability Administration and to End the NAPM LLC's Interim Role in Number Portability Administration Contract; Telephone Number Portability*, 26 FCC Rcd. 6839 (2011) .........................15

*\*In the Matter of Request of Lockheed Martin Corp. and Warburg, Pincus & Co. for Review of the Transfer of the Lockheed Martin Communications Industry Services Business*, 14 FCC Rcd. 19792 (1999)...........................8, 10, 12, 13, 14, 36, 37, 40, 42, 49

*\*In the Matter of Telephone Number Portability*, 11 FCC Rcd. 8352 (1996)......................................................................5, 11, 55

*In the Matter of Telephone Number Portability*, 12 FCC Rcd. 12281 (1997).........................................................................11, 52

*In the Matter of Toll Free Service Access Codes*, 15 FCC Rcd. 11939 (2000).............................................................................43

Lyman Johnson, *Delaware's Non-Waivable Duties*, 91 B.U. L. Rev. 701 (2011) ....................................................................48

NANC Issues Recommendations Regarding the Implementation of Telephone Number Portability, 62 Fed. Reg. 25,157 (May 8, 1997)...........51

*North American Numbering Council Issues Recommendations Regarding the Implementation of Telephone Number Portability*, 12 FCC Rcd. 5003 (1997)..................................................................12

S. Rep. No. 104-23 (1995) .....................................................................32

*The Telecommunications Act of 1996: Law & Legislative History* (Robert E. Emeritz et al. eds. 1996) ...........................................32

Toll Free Service Access Codes, 65 Fed. Reg. 53,189 (Sept. 1, 2000) .............51

## GLOSSARY OF ABBREVIATIONS

Commission ............................................. Federal Communications Commission

Administrator ..................................... Local Number Portability Administrator

Numbering Council ................................ North American Numbering Council

NAPM ...................................... North American Portability Management LLC

## INTRODUCTION

This case involves a challenge to the Federal Communications Commission's selection of Telcordia Technologies, Inc., as the next Local Number Portability Administrator.

Petitioner Neustar, Inc., serves as the current Administrator. The Administrator is responsible for local number portability, which promotes competition in the wireless and wireline telecommunications markets by enabling consumers to keep their telephone numbers when switching from one carrier to another. By maintaining the system that associates phone numbers with service providers, the Administrator ensures the proper routing of virtually every phone call and text message in the United States. It also provides critical services to public-safety, law-enforcement, and national-security agencies. Because the Administrator is privy to confidential information from carriers, its role is highly sensitive from a competitive standpoint.

The Commission's selection of Telcordia, a wholly owned subsidiary of Telefonaktiebolaget LM Ericsson, violated both the Telecommunications Act of 1996, which requires the Administrator to be an "impartial entit[y]," and the Commission's own regulations, which prohibit the Administrator from being "aligned with any particular telecommunications industry segment." Telcordia cannot serve as the Administrator because its 100% owner, Erics-

son, is aligned with the wireless segment of the telecommunications industry—a fact the Commission does not dispute.

The Commission refused to disqualify Telcordia on the basis of Ericsson's alignment with the wireless segment on the ground that "Telcordia is a separate company with a separate independent board of directors, each of whom owes fiduciary duties to Telcordia."  But the Commission's treatment of a wholly owned subsidiary as an independent business entity contravened both the Telecommunications Act and fundamental principles of corporate law.  Telcordia is aligned with the wireless segment of the industry by virtue of Ericsson's undisputed alignment with that business segment, and it fails the test for impartiality on that basis.  In addition, Telcordia should have been disqualified under the Commission's regulations because it is an affiliate of a telecommunications network equipment manufacturer.

Despite Ericsson's 100% ownership of Telcordia, the Commission also refused to "evaluate Ericsson's neutrality" in assessing Telcordia's suitability to serve as the next Administrator.  The Commission claimed that it had no obligation to do so because "Telcordia, not Ericsson, will serve as the [Administrator]."  The Commission's refusal carefully to evaluate or to investigate Ericsson's business relationships and activities when its own regulations and precedent required it to do so was arbitrary and capricious.

2

Beyond its flawed outcome, the Commission's order cannot stand because it occurred at the end of an unlawful process.  The Commission's selection of Telcordia, and its consideration of the host of policy issues implicated by that selection, constituted an exercise of the Commission's legislative authority to designate "one or more impartial entities to administer telecommunications numbering and to make such numbers available on an equitable basis."  Yet the Commission chose to skirt the rulemaking requirements of the Administrative Procedure Act.  Finally, in a selection decision that came down to cost, the Commission relied on an unsupported and invalid assumption concerning the cost of the transition to Telcordia and refused without any justification to consider Neustar's best offer.

The Commission's selection of Telcordia was improper and cannot stand.  This Court should vacate the Commission's order.

### STATEMENT OF JURISDICTION

On March 27, 2015, the Commission issued the order under review. *See Order*.  Petitioner filed a timely petition for review on April 6, 2015.  Because the Commission's order constituted final agency action, this Court has jurisdiction under 28 U.S.C. § 2342(1) and 47 U.S.C. § 402(a).  *See* pp. 25-28, *infra*.

## STATEMENT OF THE ISSUES

1.      Whether the Federal Communications Commission's selection of Telcordia was contrary to law or arbitrary and capricious because the Commission (a) failed to disqualify Telcordia under the Telecommunications Act of 1996 and the Commission's own regulations on the ground that Telcordia's 100% owner, Ericsson, is aligned with the wireless segment of the telecommunications industry; (b) failed to disqualify Telcordia under the Commission's rule barring an affiliate of a telecommunications network equipment manufacturer from serving as the Administrator; and (c) failed carefully to evaluate or to investigate Ericsson's business relationships and activities in determining that Telcordia was "impartial" and "neutral," as required by the Commission's regulations and precedent.

2.      Whether the Commission violated the Administrative Procedure Act by failing to engage in notice-and-comment rulemaking.

3.      Whether the Commission's evaluation of the costs of Neustar's and Telcordia's bids was arbitrary and capricious because the Commission made an unsupported and invalid assumption about the cost of the transition from Neustar to Telcordia and refused to consider Neustar's best offer.

## STATUTES AND REGULATIONS INVOLVED

Relevant statutory and regulatory provisions are set forth in an addendum to this brief.

## STATEMENT OF THE CASE

### A.   Background

### *1.   Number Portability*

As part of its broader effort to promote competition in the market for telephone service, the Telecommunications Act of 1996 required local telephone companies to provide "number portability" to their customers. 47 U.S.C. § 251(b)(2). Number portability is the "ability of users of telecommunications services to retain, at the same location, existing telecommunications numbers without impairment of quality, reliability, or convenience when switching from one telecommunications carrier to another." 47 U.S.C. § 153(37). It "facilitates competition . . . by eliminating the inconvenience of having to switch numbers when changing carriers." *National Telephone Cooperative Ass'n* v. *FCC*, 563 F.3d 536, 539 (D.C. Cir. 2009). The Commission subsequently required cellular and other carriers to provide number portability. *In the Matter of Telephone Number Portability*, 11 FCC Rcd. 8352, ¶¶ 155, 157 (1996) (*First Report and Order*). Number portability remains vitally important to competition in the telecommunications industry: on average, more than 100,000 phone numbers are transferred, or "ported," each day. *See Order* ¶ 4.

The Administrator operates the Number Portability Administration Center and Service Management System, which both ensures local number

portability and associates phone numbers with carriers. The system is "essential to the correct routing of both wireline and wireless calls" in the United States. *Order* ¶ 101. It is "vital to the functioning of the nation's critical communications infrastructure," *id.* ¶ 2, and is particularly essential to public-safety, law-enforcement, and national-security agencies, which "need to know which providers are associated with specific telephone numbers in order to execute lawful subpoenas and warrants," *id.* ¶ 101.

### 2.    *Applicable Statutory And Regulatory Requirements*

At the time of the enactment of the Telecommunications Act, both Congress and the Commission were acutely aware of the need for impartial numbering administration. Before 1996, AT&T, and later the Regional Bell Operating Companies (through a jointly owned company known as Bellcore), provided numbering administration for the North American Numbering Plan, the "basic numbering scheme" that permits telecommunications service in the United States. *In the Matter of Administration of the North American Numbering Plan*, 11 FCC Rcd. 2588, ¶¶ 3, 10-12 (1995) (*Administration Report and Order*).

Shortly before the enactment of the Telecommunications Act, the Commission determined that Bellcore's "association" with the Bell companies presented a "potential conflict of interest" and that a new numbering plan administrator should be selected. *Administration Report and Order*

6

¶ 31.   The Commission "require[d]" that the new administrator "not be aligned with any particular telecommunications industry segment." *Id.* ¶ 2. It determined that the numbering administrator "must be fair and impartial" and that "it would be very difficult, if not impossible" for an administrator "closely associated with a particular segment of the telecommunications industry to be impartial." *Id.* ¶ 57. Even if an administrator "aligned with a particular industry segment was impartial," moreover, "there would still likely be the perception and accusations that it was not." *Id.* The Commission therefore required the new numbering administrator to be an "independent, non-governmental entity that is not closely associated with any particular industry segment." *Id.* ¶ 46.

In the immediate aftermath of the Commission's determination, and consistent with the Commission's underlying concerns, Congress instructed the Commission in the Telecommunications Act to "create or designate one or more impartial entities to administer telecommunications numbering and to make such numbers available on an equitable basis." 47 U.S.C. § 251(e)(1). Those administrators include the one at issue here, the Local Number Portability Administrator.

The impartiality requirement for numbering administrators is a "cornerstone" of the Telecommunications Act, *Order* ¶ 179, because it ensures that administrators will be free of any actual or perceived incentive to use

their positions to skew competitive outcomes. "Of necessity, the [Administrator] is privy to competitively sensitive information that could be exploited if the [Administrator] was not unquestionably neutral." Harold Furchtgott-Roth, *The Importance of Neutrality in Number Portability Administration* 20 (2012) <apps.fcc.gov/ecfs/document/view?id=7022013438> (cited in Comments of Neustar, Inc., 47 (July 25, 2014) (Neustar Comments)). "[I]f a numbering administrator has a bias, real or perceived, towards or away from a particular technology, operating system, or company, telecommunications competition would be imperiled." *Id.* at 19.

Under the Commission's implementing regulations, a numbering administrator must be "neutral[]": *i.e.*, "impartial and not aligned with any particular telecommunication industry segment." 47 C.F.R. § 52.12(a)(1); *accord* 47 C.F.R. § 52.21(k); *see Order* ¶ 160 n.562 (noting that the requirements of Section 52.12(a) apply to the Local Number Portability Administrator). Further, the Commission has explained that a numbering administrator cannot have the "appearance" or "perception" of bias or partiality. *Administration Report and Order* ¶ 57; *see also In the Matter of Request of Lockheed Martin Corp. & Warburg, Pincus & Co. for Review of the Transfer of the Lockheed Martin Communications Industry Services Business*, 14 FCC Rcd. 19792, ¶ 3 (1999) (*Warburg Transfer Order*).

8

By incorporation, the Commission adopted additional rules to ensure the impartiality and neutrality of the Local Number Portability Administrator, including the requirement that the Administrator not be affiliated with an "entity with a *direct material financial interest* in manufacturing telecommunications network equipment." 47 C.F.R. § 52.26(a) (incorporating by reference recommendations made in the 1997 Local Number Portability Administration Selection Working Group Report); *Selection Working Group Report* §§ 4.2.2.B, 6.4.4, 6.4.5.

To ensure neutrality, the Commission also codified three specific rules: (i) an administrator "may not be an affiliate of any telecommunications service provider(s)"; (ii) an administrator, "and any affiliate thereof, may not issue a majority of its debt to, nor may it derive a majority of its revenues from, any telecommunications service provider"; and (iii) "an administrator "may . . . not . . . be subject to undue influence by parties with a vested interest in the outcome of numbering administration and activities." 47 C.F.R. § 52.12(a)(1).

As the Commission's regulations provide, in determining whether a numbering administrator satisfies the requirements of impartiality and neutrality, the Commission considers the administrator's corporate affiliations. Consistent with the Telecommunication Act, the Commission defines an "affiliate" as a "person who controls, is controlled by, or is under the direct or

9

indirect common control with another person."  47 C.F.R. § 52.12(a)(1)(i); *cf.*
47 U.S.C. § 153(2).  Under that definition, "[a] person shall be deemed to con-
trol another if such person possesses, directly or indirectly":  (A) an equity
interest of 10% or more of the other person; (B) the power to vote 10% or
more of the other person's securities; or (C) the "power to direct or cause the
direction of the management and policies of such other person," including
"by contract."  47 C.F.R. § 52.12(a)(1)(i).

According to the Commission, its neutrality criteria serve three pur-
poses.  *First*, they "ensure that entities seeking to participate in the tele-
communications marketplace obtain timely and efficient access to numbering
resources, and that no particular industry segment, consumer group, or
technology is unduly favored or disadvantaged."  *Warburg Transfer Order*
¶ 24.  *Second*, they "maintain the trust and confidence of the entities that
must submit sensitive data to the [Administrator] in its numbering admin-
istration activities."  *Id.*  *Third*, they "ensure that the [Administrator] is able
to comply with its obligations without extensive and constant Commission
oversight."  *Id.*

### 3. *The Selection Of Neustar And Its Predecessor In Inter-est As Administrator*

Following the passage of the Telecommunications Act, the Commission
directed the North American Numbering Council, a federal advisory commit-
tee, to select as Local Number Portability Administrator "one or more inde-

10

pendent, non-governmental entities that are not aligned with any particular telecommunications industry segment." *First Report and Order* ¶ 93. According to the Commission, "[n]eutral third party administration" would "ensure[] the equal treatment of all carriers and avoid[] any appearance of impropriety or anti-competitive conduct." *Id.* ¶ 92. The Commission also directed the Numbering Council to make recommendations regarding "how the [Administrator(s)] should be selected." *Id.* ¶ 95.

In October 1996, the Numbering Council established a Selection Working Group to make recommendations regarding, *inter alia*, "the neutral third party or parties" to serve as Administrator and "the requirements for selecting" the Administrator. *In the Matter of Telephone Number Portability*, 12 FCC Rcd. 12281, ¶¶ 11-12 (1997) (*Second Report and Order*). After the Selection Working Group produced a report with its recommendations concerning the selection process and other matters, *see Selection Working Group Report*, the Numbering Council adopted those recommendations and submitted them to the Commission. *Second Report and Order* ¶ 15. The Numbering Council recommended, *inter alia*, that the Commission select Neustar's corporate predecessor, Lockheed Martin IMS Corporation, a wholly owned subsidiary of Lockheed Martin Corporation, as the Administrator for part of the country (and Perot Systems, Inc., as the Administrator for the remainder). *Id.* ¶ 33.

11

In May 1997, the Commission issued a Federal Register notice soliciting comments on the Numbering Council's recommendations. *See North American Numbering Council Issues Recommendations Regarding the Implementation of Telephone Number Portability*, 12 FCC Rcd. 5003 (1997). In August 1997, after receiving comments, the Commission adopted the Numbering Council's recommendations (with specified exceptions) by incorporation in a rule. *See* 47 C.F.R. § 52.26(a). The Commission also instructed several consortia of telecommunications providers, now consolidated and known as the North American Portability Management LLC (NAPM), to negotiate and manage the contracts with the Administrators. *See* 47 C.F.R. § 52.26(b)(2).

In 1998, after Perot Systems experienced significant performance issues, Lockheed Martin IMS Corporation became the Administrator for the entire country. *Order* ¶ 7 n.20. In 1999, the Commission determined that Lockheed Martin IMS Corporation was no longer impartial because another subsidiary of Lockheed Martin Corporation had become a telecommunications service provider. *Warburg Transfer Order* ¶¶ 6, 18. Lockheed proposed the transfer of Lockheed Martin IMS's Communications Industry Services unit to Neustar, whose majority owner would be Warburg, Pincus & Company, a private equity firm. *Id.* ¶ 1.

12

In assessing Neustar's suitability to serve as a numbering administrator, the Commission determined that "any successor [administrator] also must meet the same neutrality requirements that Lockheed was required to meet." *Warburg Transfer Order* ¶ 17.  The Commission evaluated the neutrality of Neustar's proposed majority owner, Warburg, notwithstanding the fact that "Neu[s]tar, not Warburg, is subject to compliance with [the Commission's] neutrality requirements." *Id.* ¶ 30.

Warburg invested approximately 7.43% of its total assets in a variety of telecommunications service providers.  *Warburg Transfer Order* ¶ 8 n.40. Although Warburg was not directly involved in providing telecommunications services and was not aligned with any particular segment of the telecommunications industry, the Commission expressed "concern[s] about the extent of Warburg's holdings in telecommunications service providers." *Id.* ¶ 30.  The Commission also expressed "concerns about Warburg's incentive to influence Neu[s]tar in a manner that might compromise Neu[s]tar's neutrality," *id.*, and about the structure of the original proposed transaction, under which "95 percent of the equity stock of the new company" would be owned by Warburg, *id.* ¶¶ 9 & n.49.

In response to the Commission's concerns, the parties proposed a revised transaction structure, under which Warburg would own less than 10% of Neustar; Neustar management would own 28%; Lockheed would own 3%;

and a voting trust would own the remaining 59%. *Warburg Transfer Order* ¶ 10. The beneficiaries of the trust would include at least 25 individuals, including Neustar management. *Id.* ¶ 11.

The Commission approved the revised transaction. *Warburg Transfer Order* ¶ 40. It determined that the proposed voting trust would "prevent Warburg or its affiliates from exercising undue influence" over Neustar. *Id.* ¶ 31. The Commission further concluded that "[t]he presence of unaffiliated directors and trustees, who owe fiduciary duties to parties other than Warburg with a paramount interest in ensuring Neu[s]tar's neutrality, should ensure that Neu[s]tar does not compromise its neutrality obligations." *Id.* ¶ 32. Based on the revised proposed structure and additional safeguards imposed by the Commission, the Commission concluded that Warburg would not have "improper influence" over Neustar. *Id.* ¶¶ 32-37.

In 2004, the Commission modified the Warburg safeguards and Neustar became a public company. *See In the Matter of North American Numbering Plan Administration, Neustar, Inc., Request to Allow Certain Transactions Without Prior Commission Approval and to Transfer Ownership*, 19 FCC Rcd. 16982 (2004).

14

### 4.    *The Selection Of A New Administrator*

In 2007 and 2009, Telcordia Technologies, Inc., a Delaware corporation, filed petitions with the Commission seeking to institute a competitive bidding process for a new Administrator.  *See Order* ¶ 8 & n.24.

In 2011, the Commission's Wireline Competition Bureau authorized the Numbering Council to recommend the selection of the next Administrator. *See In the Matter of Petition of Telcordia Technologies Inc. to Reform or Strike Amendment 70, to Institute Competitive Bidding for Number Portability Administration and to End the NAPM LLC's Interim Role in Number Portability Administration Contract; Telephone Number Portability*, 26 FCC Rcd. 3685, ¶ 19 (2011).  The Wireline Competition Bureau tasked a NAPM subcommittee with development of a request for proposals and preparation of a vendor selection recommendation.  *See id.* ¶ 7 & Attach. A; *In the Matter of Petition of Telcordia Technologies Inc. to Reform or Strike Amendment 70, to Institute Competitive Bidding for Number Portability Administration and to End the NAPM LLC's Interim Role in Number Portability Administration Contract; Telephone Number Portability*, 26 FCC Rcd. 6839, ¶ 13 & Attach. A (2011).

The NAPM released bid documents in February 2013.  *Order* ¶ 11. The initial deadline for bids was April 5, 2013, and Neustar submitted its opening bid on that date.  *See* Letter of Aaron M. Panner, Counsel for

Neustar, to Sean A. Lev, General Counsel, Commission, Julie A. Veach, Chief, Wireline Competition Bureau, and Timothy Decker & Mel Clay, Co-Chairs, NAPM, at 2 (Apr. 24, 2013).  Neustar was the only timely bidder; Telcordia, which by that time had been acquired by Ericsson, did not submit a bid by the deadline.  *See Order* ¶ 35.

After the deadline passed, the NAPM extended the deadline for submissions, stating that it was doing so "[p]ursuant to the directions of the Wireline Competition Bureau of the Federal Communications Commission." *See* E-mail from Timothy Decker, Co-Chair, NAPM, to Sanford Williams, Special Counsel, Commission (Apr. 17, 2013).  Telcordia submitted a bid on April 22, 2013.  *See* Opp'n of Telcordia Technologies d/b/a iconectiv to Neustar's Pet. for a Declaratory Ruling 34 (Feb. 24, 2014).  In September 2013, in response to a NAPM request, the parties submitted best and final offers.  *Order* ¶ 11.  **[BEGIN HIGHLY CONFIDENTIAL INFORMATION]** ███████████████████████████████████████

███████████████████████████████████ **[END HIGHLY CONFIDENTIAL INFORMATION]**

On October 21, 2013, Neustar requested that the NAPM seek an additional round of bids and submitted a further revised proposal.  *Order* ¶ 11.

**[BEGIN HIGHLY CONFIDENTIAL INFORMATION]** ███████████████

████████████████████████████████████████████

16

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████ **[END HIGHLY CONFI-**

**DENTIAL INFORMATION]**

The Numbering Council recommended Telcordia as the next Adminis-trator without considering Neustar's second best and final offer. *See Order* ¶¶ 12, 145. The Numbering Council made no determination concerning Telcordia's impartiality or neutrality. *See* Neustar Comments 47-49.

Following the Numbering Council's announcement in March 2014 that it had voted on a recommendation, Neustar reminded the Commission of the

need to follow notice-and-comment rulemaking procedures. *See* Letter of Aaron M. Panner, Counsel to Neustar, to Marlene H. Dortch, Secretary, Commission, at 2-5 (May 6, 2014); *see also* Letter of Aaron M. Panner, Counsel to Neustar, to Marlene H. Dortch, Secretary, Commission, at 1-2 (Apr. 8, 2014). The Commission, however, proceeded without issuing a notice of proposed rulemaking or providing any Federal Register-published notice. Instead, the Commission issued a public notice in June 2014 announcing the Numbering Council's recommendation of Telcordia, providing a one-sentence description of the topics covered in the recommendation, and inviting comments. *See Commission Seeks Comment on the North American Numbering Council Recommendation of a Vendor To Serve As Local Number Portability Administrator*, 29 FCC Rcd. 6013 (2014).

In response to the Commission's notice, Neustar argued, *inter alia*, that Telcordia was barred from serving as the administrator because its 100% owner, Ericsson, was not impartial or neutral. *See* Neustar Comments 13-50. Neustar reiterated that the Commission was required to conduct a notice-and-comment rulemaking. *See id.* at 50-62.

## B.    The Order Under Review

On March 27, 2015, the Commission released an order selecting Telcordia as the next Administrator. *See Order.*

18

1.     The Commission rejected Neustar's argument that Telcordia could not satisfy the statutory and regulatory requirements that a numbering administrator be "impartial" and "neutral." *See Order* ¶¶ 160-188.  In so doing, the Commission asserted that it was not required to evaluate Ericsson's business interests and relationships, on the ground that "Telcordia, not Ericsson, will serve as the [Administrator]." *Id.* ¶ 170.  Although the Commission did not dispute that Ericsson was aligned with the wireless segment of the industry, the Commission concluded that Ericsson's alignment did not "spill[] over to Telcordia," based on the premise that "Telcordia is a separate company with a separate independent board of directors, each of whom owes fiduciary duties to Telcordia." *Id.* ¶ 172.  The Commission also refused to disqualify Telcordia on the ground that it is an affiliate of a telecommunications network equipment manufacturer (Ericsson), contending that its regulations did not contain any such prohibition. *Id.* ¶ 170.

2.     The Commission rejected Neustar's argument that it was required to select a new Administrator through notice-and-comment rulemaking. *See Order* ¶¶ 15-30.

3.     After concluding that "both bidders are qualified to serve as [Administrator]," *Order* ¶ 65, the Commission selected Telcordia based on its assessment of the costs of the two bids, *see id.* ¶¶ 134-159.  Specifically, the Commission determined that Telcordia's lower bid would "outweigh the costs

19

and potential adjustments associated with the transition to a new [Adminis-trator]." *Id.* ¶ 153.  In reaching that conclusion, the Commission made an un-supported assumption regarding the duration of the transition to Telcordia and refused to consider Neustar's second best and final offer.  *Id.* ¶¶ 42-46, 153 n.535.  The Commission determined that its refusal to consider Neustar's second best and final offer did not taint the fairness of the proceeding.  *Id.* ¶¶ 37, 42-46.

## SUMMARY OF ARGUMENT

The Commission's order designating Telcordia as the next Local Num-ber Portability Administrator constituted final agency action.  On multiple grounds, that order was both contrary to law and arbitrary and capricious.

I.     The Commission's selection of Telcordia was both unlawful and arbitrary and capricious because Telcordia is not "impartial" or "neutral" and is therefore ineligible to serve as the Administrator.  Ericsson's undis-puted alignment with the wireless segment of the telecommunications indus-try disqualifies Telcordia from serving as the Administrator under both the Telecommunications Act and the Commission's own regulations.  It is one of the most familiar principles of corporate law that a parent and its wholly owned subsidiary have a complete unity of interest.  Indeed, under Delaware law, a wholly owned subsidiary has an inherent motivation, and its directors have a fiduciary obligation, to serve the economic interests of the corporate

20

parent.  Because Ericsson is aligned with the wireless segment of the indus-
try, so too is Telcordia—which, at an absolute minimum, will be perceived as
biased by virtue of its identity of interests with Ericsson.

The Commission also acted arbitrarily and capriciously by selecting an
affiliate of a telecommunications network equipment manufacturer as the
next Administrator.  The Commission's regulations incorporate a bright-line
rule prohibiting both telecommunications network equipment manufacturers
and their affiliates from serving as the Administrator.  The Commission
acknowledged that Ericsson is an equipment manufacturer, and it is indis-
putable that Telcordia is an affiliate of Ericsson.  Even apart from Ericsson's
alignment with the wireless segment of the telecommunications industry,
therefore, Telcordia should have been disqualified.

The Commission acted arbitrarily and capriciously by refusing to un-
dertake any meaningful evaluation of Ericsson's business relationships.  The
Commission has consistently considered the business affiliations of a pro-
spective numbering administrator's corporate parent or majority owner in
assessing the neutrality of an administrator, and the Commission's regula-
tions require consideration of the business relationships and activities of an
administrator's corporate affiliates.  Here, however, the Commission deliber-
ately blinded itself to the extent of Ericsson's entanglements with wireless

21

providers, based on the erroneous assumption that Telcordia is an independent company whose directors owe fiduciary duties to Telcordia.

While the Commission purported to establish "safeguards" to protect against the potential for improper influence by Ericsson, those safeguards were insufficient. Having refused to consider the extent of Ericsson's partiality, the Commission had no basis to judge the efficacy of its purported safeguards. The safeguards were also inadequate in light of the fundamental principle of Delaware law that Telcordia's directors are obligated to act in the best interests of its corporate parent—and the reality that Telcordia runs its business for Ericsson's economic benefit.

II.     The Commission violated the Administrative Procedure Act by selecting Telcordia as the next Administrator without conducting a notice-and-comment rulemaking. The designation of an impartial administrator involves the exercise of legislative authority, and Section 251 explicitly requires the Commission to act pursuant to rulemaking. Rulemaking was also required because the selection of Telcordia implicated a host of important policy issues that the Commission acknowledged in its order, including national-security and public-safety matters, cybersecurity concerns, and issues concerning the cost, duration, and risks of a transition. Moreover, the order repealed the Commission's prior selection of Neustar's predecessor in interest after notice-and-comment rulemaking and altered neutrality requirements

22

that were established through such rulemaking. And the Commission's actions had only future effects—effects that will be felt not only by Neustar and Telcordia, but also by every customer and telecommunications provider that makes use of or pays for number portability.

The Commission's failure to engage in notice-and-comment rulemaking was highly prejudicial. By circumventing the notice-and-comment rulemaking process, the Commission failed to seek comment on the many significant policy issues raised by a potential change in Administrator. For example, by adopting new, relaxed neutrality requirements for the first time in its order, the Commission did not afford interested parties or the public an appropriate opportunity to comment on that critical issue. And, if the Commission had conducted the required rulemaking, it would have been subject to the Regulatory Flexibility Act's requirements: specifically, the requirement to provide a meaningful assessment of how the selection of Telcordia and the costly transition process would affect the many small carriers that rely on and pay for the Administrator's services.

III. The Commission asserted that its selection of Telcordia as the new Administrator was driven by cost considerations. But the Commission's cost evaluation was arbitrary and capricious in two crucial respects. *First*, the Commission's evaluation was based on a groundless assumption concerning the duration of the transition from Neustar to Telcordia. That assump-

23

tion is not only unsupported but affirmatively contradicted by the record, which establishes that the transition would take at least two and a half years. The Commission's faulty assumption undermined the entire rationale for its selection of Telcordia.

*Second*, without justification, the Commission refused to consider Neustar's best offer. The Commission decisively tipped the scales against Neustar by refusing to consider that offer in its evaluation of the competing proposals. If the Commission had considered that offer, it would have determined that it was superior to Telcordia's bid.

## STANDING

Neustar has standing because it participated in the proceeding before the Commission and is adversely affected and substantially aggrieved by the order under review.

## STANDARD OF REVIEW

This Court reviews the Commission's order under the familiar standard of the Administrative Procedure Act, which precludes agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Agency action is contrary to law if it violates the plain language of a statute or "frustrate[s] the policy that Congress sought to implement." *Shays* v. *FEC*, 528 F.3d 914, 925 (D.C. Cir. 2008) (internal quotation marks

omitted).  Agency action is arbitrary and capricious if "the agency fails to comply with its own regulations," *National Environmental Development Ass'n's Clean Air Project* v. *EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (internal quotation marks omitted), because an agency cannot "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books," *FCC* v. *Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  Agency action is also arbitrary and capricious if the agency has "entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Manufacturers Ass'n* v. *State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983).  In defending its action, an agency is limited to the grounds "upon which the record discloses that its action was based."  *SEC* v. *Chenery Corp.*, 318 U.S. 80, 87 (1943).

**ARGUMENT**

## I.   THE ORDER UNDER REVIEW CONSTITUTED FINAL AGENCY ACTION

As a preliminary matter, the Commission has moved to dismiss Neustar's petition on the ground that it is premature.  A motions panel referred the motion to the merits panel and ordered that the parties address the issue of jurisdiction in their briefs.  Because the order under review read-

25

ily meets both of the requirements for final agency action, the Commission's motion should be denied.

*First*, the selection of Telcordia "mark[s] the 'consummation' of the agency's decisionmaking process" and is not "of a merely tentative or interlocutory nature." *Bennett* v. *Spear*, 520 U.S. 154, 178 (1997) (citation omitted). After a four-year selection process, the Commission made a definitive decision to select Telcordia as the next local number portability administrator by exercising the agency's legislative authority, conferred by the Telecommunications Act, to "create or designate" numbering administrators. *Order* ¶ 1; *see* 47 U.S.C. § 251(e)(1). Throughout the order, the Commission refers to Telcordia as the "next [Administrator]." *See, e.g., Order* ¶¶ 1, 3, 33, 58 n.221, 198. That determination is not tentative or subject to change; in the order under review, the Commission rejected all of Neustar's challenges to the selection of Telcordia. In the wake of the Commission's order, there is no further opportunity for Neustar or anyone else to attempt to persuade the Commission that it made the wrong choice.

*Second*, the order under review establishes "rights [and] obligations" of Telcordia, Neustar, and third parties with respect to the ordered change in the Administrator. *Bennett*, 520 U.S. at 178 (internal quotation marks omitted). "Final orders are not limited to the last order issued in a proceeding, but to be final an order must impose an obligation, deny a right or fix some

26

legal relationship as a consummation of the administrative process." *Reuters Ltd.* v. *FCC*, 781 F.2d 946, 947 n.1 (D.C. Cir. 1986) (internal quotation marks omitted). The order satisfies that requirement because, among other things, it "determines *immediately* which entity is authorized to negotiate [the] contract"—*i.e.*, Telcordia and not Neustar. *Order* ¶ 20. The order also imposes detailed obligations with respect to the process of transitioning from Neustar to Telcordia—obligations that already have taken effect and pursuant to which various parties have already taken required actions. *See* Neustar Opp'n to Mot. to Dismiss, Decl. of William P. Reidway. "Once the agency publicly articulates an unequivocal position . . . and expects regulated entities to alter their primary conduct to conform to that position," the agency relinquishes the benefit of postponed judicial review. *Ciba-Geigy Corp.* v. *EPA*, 801 F.2d 430, 436 (D.C. Cir. 1986). That is precisely what has happened here.

The mere fact that the order contemplates further actions on the part of Telcordia and the NAPM does not render Telcordia's selection tentative. In the order, the Commission specifically directed the NAPM to begin contract negotiations with Telcordia. *Order* ¶ 193. The Commission argues that Telcordia might fail to reach agreement with the NAPM, but that misses the point: the Commission has definitively approved the selection of Telcordia to serve as the next administrator, and, in so doing, has rejected Neustar's chal-

27

lenges to that selection.  *Id.* ¶¶ 14-64, 151-157, 167-188, 203.  Whatever the terms of the contract with Telcordia, they will not alter the Commission's legal determinations in making its selection.  And the mere possibility that a future event (such as unanticipated failure in the contracting process) could require the Commission to reconsider its selection is insufficient to deprive that decision of finality.  *See, e.g.*, *Sackett* v. *EPA*, 132 S. Ct. 1367, 1372 (2012); *National Environmental Development Ass'n's Clean Air Project*, 752 F.3d at 1006; *General Electric Co.* v. *EPA*, 290 F.3d 377, 380 (D.C. Cir. 2002). Because the Commission's order constituted final agency action, this Court has jurisdiction over Neustar's petition for review, and the Commission's motion to dismiss should be denied.

## II.    THE ORDER MUST BE VACATED BECAUSE TELCORDIA IS NOT 'IMPARTIAL' OR 'NEUTRAL'

The Commission's selection of Telcordia was both contrary to law and arbitrary and capricious because Telcordia is not "impartial" or "neutral." The Telecommunications Act directs the Commission to designate only "impartial entities" to administer numbering.  47 U.S.C. § 251(e)(1).  The Commission has implemented that statutory obligation through regulations dictating that a numbering administrator must be "impartial and not aligned with any particular telecommunication industry segment."   47 C.F.R. § 52.12(a)(1); *accord* 47 C.F.R. § 52.21(k).

Telcordia does not satisfy that critical requirement because it is wholly owned by Ericsson, a major provider of telecommunications services and equipment that is aligned with the wireless segment of the industry—a fact the Commission does not dispute. In addition, the Commission's rules independently bar Telcordia, as the affiliate of a telecommunications network equipment manufacturer, from serving as the Administrator. The Commission's refusal to abide by its own rules was arbitrary and capricious.

The Commission's selection of Telcordia was also arbitrary and capricious because the Commission concluded that it was not required to evaluate Ericsson's neutrality, on the ground that "Telcordia, not Ericsson, will serve as the [Administrator]." *Order* ¶ 170. As a result, the Commission did not undertake any meaningful evaluation of Ericsson's business relationships and activities. By determining that Telcordia was "impartial" and "neutral" without considering the interests of Telcordia's 100% owner, the Commission violated its own regulations, departed from its own precedent, and acted without a reasoned basis.

## A.    The Commission Acted Contrary To Law and Arbitrarily and Capriciously By Concluding That Ericsson's Undisputed Alignment With the Wireless Industry Did Not Disqualify Telcordia

Far from disputing that Ericsson would be ineligible to serve as the Administrator, the Commission seemingly acknowledged that Ericsson is

29

"aligned with" the wireless segment of the telecommunications industry, *Order* ¶¶ 172, 181 & n.593—and that, as a result, Ericsson "might be tempted to prioritize" its contractual relationships with wireless providers "over the [Administrator] contract," *id.* ¶ 181. But the Commission refused to disqualify Telcordia on that basis, asserting that Ericsson's alliance with the wireless industry does not "spill[] over to Telcordia" because "Telcordia is a separate company with a separate independent board of directors, each of whom owes fiduciary duties to Telcordia." *Id.* ¶ 172. The Commission's decision was both contrary to law and arbitrary and capricious.

1.     The Telecommunications Act requires a numbering administrator to be an "impartial entit[y]." 47 U.S.C. § 251(e)(1). Where a wholly owned subsidiary is a potential numbering administrator, the statutory requirement of an "impartial entit[y]" naturally takes into account the impartiality of the *entire* corporate entity—not the subsidiary considered in isolation.

The phrase "impartial entit[y]" must be interpreted in light of "settled principles of corporate law." *Dole Food Co.* v. *Patrickson*, 538 U.S. 468, 474 (2003). Absent contrary indicia of congressional intent, this Court should assume that Congress intended to incorporate those background principles. *See, e.g., International Brotherhood of Painters & Allied Trades Union* v. *George A. Kracher, Inc.*, 856 F.2d 1546, 1550 (D.C. Cir. 1988).

It is one of the most familiar principles of corporate law that "[a] parent and its wholly owned subsidiary have a complete unity of interest." *Copperweld Corp.* v. *Independence Tube Corp.*, 467 U.S. 752, 771 (1984). "Their objectives are common, not disparate; [and] their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one." *Id.* If a corporate parent is biased in favor of a particular industry segment, its wholly owned subsidiary will necessarily share the same prejudice because their interests are "fully aligned." *Quadrant Structured Products Co.* v. *Vertin*, 102 A.3d 155, 184 (Del. Ch. 2014).

Moreover, under Delaware law, because the "corporate purposes" of a parent and its wholly owned subsidiary "are one and the same," *Blish* v. *Thompson Automatic Arms Corp.*, 64 A.2d 581, 605 (Del. 1948), "the directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders," *Anadarko Petroleum Corp.* v. *Panhandle Eastern Corp.*, 545 A.2d 1171, 1174 (Del. 1988). "The [subsidiary's] directors look[] out only for [the parent's] interest because, substantively, that [is] their duty." *VFB LLC* v. *Campbell Soup Co.*, 482 F.3d 624, 635 (3d Cir. 2007) (applying Delaware law); *see also Quadrant*, 102 A.3d at 184 (noting that, "in a parent and wholly-owned subsidiary context, the directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders" (cit-

31

ing *Anadarko*, 545 A.2d at 1174)); *Grace Bros.* v. *Uniholding Corp.*, No. 17612, 2000 WL 982401, at *12 (Del. Ch. July 12, 2000) (stating that "[i]t is by no means a novel concept of corporate law that a wholly-owned subsidiary functions to benefit its parent").

There is no evidence in Section 251(e)(1) or its legislative history that Congress intended to deviate from the basic principles that a parent and its wholly owned subsidiary have a complete unity of interest and that a wholly owned subsidiary is required to act in the best interests of the parent. To the contrary, at the time it passed the Telecommunications Act, Congress was well aware of the Commission's "ongoing proceeding on numbering administration" related to Bellcore, S. Rep. No. 104-23, at 52 (1995), including the Commission's determination that Bellcore's 100% ownership by the Bell companies raised a "potential conflict of interest" that should be addressed by the "selection of a new" administrator, *Administration Report and Order* ¶ 31; *see also The Telecommunications Act of 1996: Law & Legislative History* 7 (Robert E. Emeritz et al. eds. 1996) (citing *Administration Report and Order*).

Congress's "failure to revise or repeal the agency's interpretation" constitutes "persuasive evidence that th[is] interpretation is the one intended by Congress." *Sebelius* v. *Auburn Regional Medical Center*, 133 S. Ct. 817, 827-828 (2013) (internal quotation marks omitted). It would eviscerate Con-

32

gress's command that numbering administration be conducted only by "im-
partial entities"—the sole statutory criterion for selection—if the Commis-
sion could select the wholly owned subsidiary of a clearly partial entity as a
numbering administrator. The phrase "impartial entit[y]" must take into ac-
count the activities of the wholly owned subsidiary and its parent, not the
subsidiary in isolation, in order to prevent such a counterintuitive result. *Cf.*
*Alarm Industry Communications Committee* v. *FCC*, 131 F.3d 1066, 1069-
1071 (D.C. Cir. 1997) (vacating Commission's interpretation of the word "en-
tity" in Section 275(a)(2) of the Telecommunications Act to mean an entity
with "an independent legal existence" because it reflected "no assessment of
statutory objectives, no weighing of congressional policy, no application of
expertise in telecommunications") (citing *Copperweld*, 467 U.S. at 772).

2.    Ericsson is not impartial because it is plainly "aligned with [a]
particular telecommunication industry segment":  namely, the wireless seg-
ment.  47 C.F.R. §§ 52.12(a)(1), 52.21(k).  The Commission did not dispute—
and, indeed, seemingly acknowledged—that Ericsson is so aligned.  *See Or-
der* ¶¶ 172, 181 & n.593.

Ericsson's business is deeply intertwined with that of the major wire-
less providers, whose networks Ericsson manages. *See Order* ¶ 164; Neustar
Comments 14-18.  Under managed services agreements with two of the four
major wireless providers, Sprint and T-Mobile, Ericsson "takes responsibil-

ity for network design, planning and building, including day-to-day operations." Neustar Comments 15 & n.11 (quoting Letter from John T. Nakahata, Counsel, Telcordia, to the NAPM and NAPM Subcommittee, at Telcordia06084 (Apr. 4, 2013) (Nakahata Letter)). Ericsson's managed services agreement with Sprint alone is a seven-year, $5 billion agreement. *See* Neustar Comments 15.

Ericsson is also the world's largest producer of wireless networks and sells network equipment to all four of the major wireless providers in the United States (AT&T, Verizon Wireless, Sprint, and T-Mobile). Ericsson has an estimated $4 billion to $5 billion contract with Sprint to supply Sprint's network infrastructure, *see* Neustar Comments 19-20, and Ericsson's equipment sales to the wireless industry account for approximately 54% of its total revenue, *see id.* at 19.

Ericsson boasts that "[e]very time you make a call or use an app on your smartphone, tablet, or mobile computer, you are probably using one of our solutions and one of the networks provided or managed by us." Ericsson 2013 Annual Report 2 (cited in Neustar Comments 18 n.29). The Commission recognized that "Ericsson's managed services contracts and equipment sales revenues are worth considerably more than its bid for the [Administrator] contract"—and that, as a result, "Ericsson might be tempted to priori-

tize those contracts and sales over the [Administrator] contract." *Order* ¶ 181.

Ericsson's agreements with two of the four major wireless providers, and its equipment sales to all four, align it with the wireless segment of the telecommunications industry and strip it of any purported impartiality. *See* Neustar Comments 18-19. Providers in other segments of the industry would have every reason for concern that Ericsson would look out for and protect the interests of the major wireless providers that are its customers. Indeed, parties that filed comments in response to the Commission's public notice objected to Ericsson's lack of neutrality on precisely this ground. *See, e.g.*, Comments of the LNP Alliance 2-3, 11 (July 25, 2014); Comments of U.S. TelePacific Corp. and HyperCube Telecom, LLC, 4 (July 25, 2014).

3. The Commission's claim that Ericsson's undisputed alignment with the wireless industry does not spill over to Telcordia because Telcordia is an independent entity is erroneous under basic principles of Delaware corporate law—a matter outside of the Commission's principal jurisdiction, as to which it has no special expertise. "[Agencies] may not disregard settled principles of corporate law." *Esmark, Inc.* v. *NLRB*, 887 F.2d 739, 753 (7th Cir. 1989). As Ericsson's wholly owned subsidiary, Telcordia's economic interests are fully aligned with Ericsson's. And, contrary to the Commission's assertion, the duties of Telcordia's directors run as a matter of law not to

Telcordia, but to Ericsson. *See* pp. 31-32, *supra*; pp. 48-49, *infra*. It is a fundamental principle that agency action cannot be sustained where it is based on an erroneous view of the law. *See*, *e.g.*, *Chenery*, 318 U.S. at 94.

4.     Ericsson's undisputed alignment with the wireless segment disqualifies Telcordia, its wholly owned subsidiary, from serving as the Administrator. Because Ericsson, like the Bell companies, is "closely associated with a particular segment of the telecommunications industry," *Administration Report and Order* ¶ 57, so too is Telcordia. The selection of the wholly owned subsidiary of a corporation that the Commission acknowledged "might be tempted to prioritize" its contractual relationships with wireless providers "over the [Administrator] contract," *Order* ¶ 181, runs directly contrary to the fundamental requirement that the Administrator be an "impartial entit[y]," 47 U.S.C. § 251(e)(1), that will not "unduly favor[] or disadvantage[]" any "particular industry segment," *Warburg Transfer Order* ¶ 24.

At a minimum, there will be an "appearance" and "perception," *Administration Report and Order* ¶ 57, that Telcordia will favor the wireless segment of the industry because Telcordia is 100% owned by Ericsson—a matter the Commission completely failed to address. As the wireless trade association CTIA—which has intervened on behalf of the Commission in this action—emphasized in objecting to Bellcore as a numbering administrator, "it is crucial that the administrator be impartial *and* avoid the appearance of

36

any partiality." Comments of CTIA, CC Docket No. 92-237, at 3 (June 7, 1994).

The Commission's attempt to impose "safeguards" to prevent Telcordia from "be[ing] subject to undue influence by Ericsson or other outside parties," *Order* ¶ 168, does nothing to alter Telcordia's alignment with the wireless industry by virtue of the undisputed alignment of its 100% owner. The safeguards required by the Commission attempt to address a different issue—namely, whether Telcordia will be subject to "undue influence by parties with a vested interest in the outcome of numbering administration and activities." 47 C.F.R. § 52.12(a)(1)(iii); *see*, *e.g.*, *Order* ¶ 182. They do not address or remedy Telcordia's alignment—and perceived alignment—with the wireless segment of the telecommunications industry. *See Administration Report and Order* ¶ 57. In the Warburg Transfer Order—the precedent cited by the Commission with respect to the safeguards it imposed on Telcordia, *Order* ¶ 182 n.627—the Commission imposed safeguards solely to guard against "undue influence" by Warburg. *Warburg Transfer Order* ¶ 34. Warburg, unlike Ericsson, was not aligned with any segment of the telecommunications industry, and the Commission did not purport to cure any alignment problem by virtue of the safeguards it imposed there.

Putting numbering administration in the hands of the wholly owned subsidiary of an entity that is aligned with a particular segment of the tele-

communications industry is irreconcilable with both the Telecommunications Act's mandate of impartiality and the Commission's specific rule that the Administrator "not [be] aligned with any particular telecommunication industry segment." 47 C.F.R. §§ 52.12(a)(1), 52.21(k). By refusing to disqualify Telcordia, the Commission acted both contrary to law and arbitrarily and capriciously.

### B. The Commission Acted Arbitrarily and Capriciously By Selecting The Affiliate Of A Telecommunications Network Equipment Manufacturer as Administrator

The Commission also acted arbitrarily and capriciously, in violation of its own regulations, by selecting an affiliate of a telecommunications network equipment manufacturer as the next Administrator.

The Commission's regulations incorporate a bright-line rule prohibiting both telecommunications network equipment manufacturers and their affiliates from serving as the Administrator. According to the regulations, "[l]ocal number portability administration shall comply with the recommendations of the North American Numbering Council . . . as set forth" in the 1997 Local Number Portability Administration Selection Working Group Report. 47 C.F.R. § 52.26(a). One of the "recommendations" in the report was that the Commission not select as an administrator "any entity with a *direct material financial interest* in manufacturing telecommunications network equipment" or "any entity affiliated in other than a de[] minim[i]s way"

38

with such an entity.  *Selection Working Group Report* § 4.2.2(B)(2)-(3); *see also id.* §§ 6.4.4, 6.4.5 (recommending "adoption of the process used to make [Administrator] vendor selections," which is "extensively discussed in Section 4 above").

In its order, the Commission acknowledged that Ericsson "makes telecommunications equipment," *Order* ¶ 164, and apparently conceded that Ericsson is a "major manufacturer of telecommunications networking equipment," *id.* ¶ 169.  Telcordia, as a wholly owned subsidiary, has a more than a *de minimis* affiliation with Ericsson.  Accordingly, Telcordia is ineligible to be designated as the Administrator under the Commission's rule.

The Commission conceded that it "expressly incorporated by reference into its rules certain *recommendations* of the 1997 Selection Working [Group Report]."  *Order* ¶ 170.  The Commission contended that it incorporated only the "recommendations" made in section 6 of the report, not the "process" described in section 4 (which contains the prohibition).  *Id.*  But Section 6 of the report expressly includes the "[r]ecommendation" that the Commission "adopt[]  .  .  .  the process used to make [Administrator] vendor selections .  .  .  extensively discussed in Section 4 above."  *Selection Working Group Report* §§ 6.4.4, 6.4.5.  The equipment-manufacturer prohibition contained in section 4 was therefore incorporated as part of a section 6 "recommendation."

Indeed, the Commission's regulation expressly excludes from incorporation appendices D and E of the report.  *See* 47 C.F.R. § 52.26(a).  Because section 6 of the report cross-referenced those appendices, *see Selection Working Group Report* §§ 6.5.4, 6.7.2, the express exclusion of the appendices constitutes an acknowledgment that they otherwise would have been incorporated by reference, just as the equipment-manufacturer prohibition contained in section 4 was incorporated by reference in the Section 6 recommendation that the process discussed in Section 4 be adopted.

Consistent with the foregoing analysis, the Commission mandated in the Warburg Transfer Order that "any successor [numbering administrator] also must meet the same neutrality requirements that Lockheed was required to meet."  *Warburg Transfer Order* ¶ 17.  One of those requirements was that an affiliate of an "entity with a direct material financial interest in manufacturing telecommunications network equipment" could not serve as an administrator.  *Selection Working Group Report* §§ 4.2.2, 6.4.4, 6.4.5 (emphasis omitted).  Because Lockheed was required to satisfy that requirement, so too was Telcordia.

In an effort to salvage its selection of Telcordia, the Commission asserted that "Telcordia itself is not a telecommunications equipment manufacturer, so even if the Commission had incorporated the language to which Neustar refers as a 'prohibition' into its rules, that specific language would

40

not extend to Telcordia." *Order* ¶ 170. But that is just wrong. The plain language of the prohibition bars "any entity affiliated in other than a de[] minim[i]s way" with a telecommunications network equipment manufacturer from serving as the Administrator. *Selection Working Group Report* § 4.2.2(B)(2)-(3). As a wholly owned subsidiary, Telcordia is affiliated in more than a *de minimis* way with Ericsson. Even apart from Ericsson's alignment with the wireless segment of the telecommunications industry, therefore, Telcordia should have been disqualified as the affiliate of a telecommunications network equipment manufacturer.

## C. The Commission Acted Arbitrarily And Capriciously By Disregarding Ericsson's Lack of Neutrality

At a minimum, the Commission acted arbitrarily and capriciously when it declared Telcordia "neutral" without fully evaluating Ericsson's partiality. The Commission categorically denied that it had any obligation to evaluate Ericsson, on the ground that "Telcordia, not Ericsson, will serve as the [Administrator]." *Order* ¶ 170. But the Commission's own precedent and regulations demonstrate that it could not conduct a reasoned evaluation of Telcordia's neutrality without first evaluating the extent of Ericsson's partiality and susceptibility to industry interests. Nor could the Commission cure its failure to conduct the necessary evaluation of Ericsson's partiality simply by imposing "safeguards" on Telcordia to address any potential undue influence by Ericsson.

41

1.     In assessing the neutrality of a numbering administrator, the Commission has consistently considered the business affiliations of the administrator's corporate parent or majority owner.  Even before the Telecommunications Act was enacted, the Commission determined that Bellcore, a consortium 100% owned by the Bell companies, suffered from a "potential conflict of interest" because of "its association with" those companies.  *Administration Report and Order* ¶ 31.  The Commission determined that, in order to protect and promote competition in the telecommunications market, it was "appropriate to shift administrative responsibilities for all domestic numbering matters to a neutral entity." *Id.* ¶ 14.

Similarly, before designating Lockheed Martin IMS Corporation as a numbering administrator, the Commission evaluated the affiliations of its corporate parent, Lockheed Martin Corporation.  *See In the Matter of Administration of the North American Numbering Plan*, 12 FCC Rcd. 23040, ¶¶ 70-81 (1997) (*Third Report and Order*).  Lockheed Martin IMS Corporation was later disqualified from serving as a numbering administrator because a different subsidiary of its corporate parent had become a telecommunications service provider.  *Warburg Transfer Order* ¶¶ 1, 18.  And before approving the transfer of numbering administration to Neustar, the Commission thoroughly evaluated the affiliations of Warburg, the private-equity firm that was Neustar's proposed majority owner.  *See id.* ¶¶ 8, 28-30; *see al-*

42

*so Third Report and Order* ¶¶ 99-110 (examining the affiliate relationships of Bellcore, the corporate parent of Database Service Management, Inc.); *In the Matter of Toll Free Service Access Codes*, 15 FCC Rcd. 11939 (2000) (evaluating the affiliate relationships of the new corporate parent of Database Service Management).

By refusing to engage in a similar analysis here, the Commission improperly departed from its prior practice without explanation or even acknowledgment. "Where an agency applies different standards to similarly situated entities and fails to support this disparate treatment with a reasoned explanation and substantial evidence in the record, its action is arbitrary and capricious and cannot be upheld." *Burlington Northern & Santa Fe Railway Co.* v. *Surface Transportation Board*, 403 F.3d 771, 777 (D.C. Cir. 2005).

2.    Consistent with its past practice, the Commission's regulations require consideration of the business relationships and activities of the administrator's corporate parent in assessing the neutrality of a numbering administrator. To begin with, the Commission's regulations provide that a numbering administrator must not be "aligned with any particular telecommunication industry segment." 47 C.F.R. §§ 52.12(a)(1), 52.21(k). As discussed above, any reasoned consideration of the "alignments" of a wholly owned subsidiary necessarily includes an evaluation of the business interests of its parent. *See* pp. 30-33, 35-38, *supra*.

43

In addition, the Commission's regulations expressly require consideration of "affiliates" and other parties that may subject a numbering administrator to "undue influence." For example, the Commission's regulations prohibit the "affiliate of any telecommunications service provider[]" from serving as an administrator. 47 C.F.R. § 52.12(a)(1)(i). The Commission's regulations also prohibit any "affiliate" of an administrator from "deriv[ing] a majority of its revenues from[] any telecommunications service provider." 47 C.F.R. § 52.12(a)(1)(ii). And the Commission's regulations provide that an administrator "may . . . not . . . be subject to undue influence by parties with a vested interest in the outcome of numbering administration and activities." 47 C.F.R. § 52.12(a)(1)(iii).

The Commission failed to conduct a meaningful analysis of whether the activities of Ericsson—which bills itself as "the largest telecom services provider in the world," Ericsson 2013 Annual Report 16 (cited in Neustar Comments 4 n.3)—caused its wholly owned subsidiary Telcordia to violate any of these requirements. In particular, Ericsson's managed services agreements plainly subjected Ericsson, and thus Telcordia, to "undue influence." *See* pp. 33-35, *supra*. Under the terms of at least one agreement, Ericsson was required to "ensure that adequate telephone numbering resources are available," to consult "on all matters involving interpretation of number administration rules and policies," and to "provide necessary data, analysis and

44

support for formal interaction with regulatory authorities affecting number administration issues." Neustar Comments 17. Ericsson thus has a special need—and perhaps even a contractual obligation—to ensure that any activities relating to numbering administration have no adverse effect on the operations of its wireless customers.

While the Commission acknowledged that Ericsson had contractual relationships with certain wireless providers, *see Order* ¶¶ 171-172, the Commission deliberately blinded itself to the extent of Ericsson's entanglements with those and other providers. **[BEGIN HIGHLY CONFIDENTIAL IN-FORMATION]** ███████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

█████████████████████    ████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

███████████████████████████████████

███████████████████████████████████

**[END HIGHLY CONFIDENTIAL INFORMATION]**

The Administrative Procedure Act does not permit the Commission to "st[i]ck its head in the sand." *Greyhound Lines, Inc.* v. *United States*, 600 F.2d 999, 1002 (D.C. Cir. 1979) (per curiam). Where an agency deliberately fails to "examine the relevant data and articulate a satisfactory explanation for its action," the agency's action is arbitrary and capricious and thus cannot be sustained. *State Farm*, 463 U.S. at 43; *accord Public Citizen* v. *Federal Motor Carrier Safety Administration*, 374 F.3d 1209, 1221-1222 (D.C. Cir. 2004).

3.     At the same time that it refused to consider Ericsson's partiality, the Commission acknowledged that Ericsson "might be tempted to priori-tize" its contractual relationships with wireless providers "over the [Adminis-trator] contract." *Order* ¶ 181. On that basis, the Commission adopted "safeguards" in an attempt to "restrict Ericsson's ability to exert undue in-fluence" over Telcordia. *Id.* ¶ 182. But the safeguards against "undue influ-ence" were an attempted cure for a problem the Commission did not fully understand, for two simple reasons. *First*, the Commission simply refused to consider evidence bearing on the issue of Ericsson's business relationships and activities. Because the Commission failed fully to evaluate the nature

and extent of Ericsson's partiality, it had an inadequate factual foundation from which it could design safeguards sufficient to ensure that Ericsson's partiality did not infect its subsidiary.  *See*, *e.g.*, *Butte County* v. *Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010).  *Second*, Telcordia led the Commission to the erroneous legal conclusion that the directors of a Delaware wholly owned subsidiary owe their duty of loyalty to the subsidiary and not to the parent. *Compare* Nakahata Letter at Telcordia06081-82 & nn.42-44; *Order* ¶¶ 172, 178, 185, *with* pp. 31-32, *supra*.  Because the Commission misconstrued the background law, it failed to impose any restriction on Ericsson or Telcordia sufficient to address the partiality problem.

In fact, given both Ericsson's partiality and the identity of interest between a corporate parent and its wholly owned subsidiary, the Commission's purported safeguards are plainly inadequate.  The Commission determined that it could shield Telcordia from Ericsson's influence through a host of mechanisms:  principally, (1) requiring Telcordia to maintain a corporate board with a majority of "independent directors" and (2) requiring Ericsson to transfer its voting stock in Telcordia to a voting trust administered by unaffiliated trustees appointed by Ericsson (with the Commission's approval). *See Order* ¶¶ 179, 182.  But the Commission's determination was arbitrary and capricious because the Commission entirely failed to consider relevant facts and misconstrued fundamental principles of Delaware corporate law.

47

Neither of the Commission's principal "safeguards" alters the fiduciary duties of Telcordia's directors. The directors' status as independent is simply irrelevant to identifying the beneficiary of their fiduciary obligations, despite the Commission's unsupported assertion to the contrary. *See Order* ¶ 185. And the existence of a voting trust does nothing to alter the fiduciary obligations of the Telcordia board, which continue to be governed by Delaware law.

Moreover, the Commission has no power to eliminate Telcordia's directors' fiduciary duties to Ericsson under Delaware law. The fiduciary duties of corporate directors are "constant" and "unremitting." *Malone* v. *Brincat*, 722 A.2d 5, 10 (Del. 1998) (en banc). The "eviscerat[ion]" of a corporate director's fiduciary duty of loyalty "is expressly forbidden by the [Delaware General Corporation Law]." *Sutherland* v. *Sutherland*, No. 2399, 2009 WL 857468, at *4 (Del. Ch. Mar. 23, 2009). A director's duty of care "may not be eliminated," and "[n]either the duty of loyalty, nor the consequences of its breach, may be altered in any way." Lyman Johnson, *Delaware's Non-Waivable Duties*, 91 B.U. L. Rev. 701, 705 (2011). "To the extent that a contract, or a provision thereof, purports to require a board to act or not act in such a fashion as to limit the exercise of fiduciary duties, it is invalid and unenforceable." *Paramount Communications Inc.* v. *QVC Network Inc.*, 637 A.2d 34, 51 (Del. 1994). The Commission never explained how its safeguards were adequate to insulate Telcordia in light of these principles.

The Commission seemingly believed that the voting trust it adopted in its *Warburg Transfer Order* provided a precedent for its use of a voting trust for Telcordia. *See Order* ¶ 184. But the two cases bear little resemblance to each other, and the Commission simply ignored the critical differences between them. Neustar was not the wholly owned subsidiary of an entity that is subject to undue influence by a particular segment of the telecommunications industry. And, although Warburg held a majority of the beneficial interest in Neustar, Neustar management owned 28% of the company and Lockheed owned an additional 3%. *See Warburg Transfer Order* ¶ 10.

In approving the use of a voting trust in the *Warburg Transfer Order*, the Commission expressly relied on the presence of additional shareholders, at least 25 individual trust beneficiaries, and "unaffiliated directors and trustees, who owe fiduciary duties to parties other than Warburg." *Id.* ¶¶ 10-11, 32. The duty of Neustar's directors was to maximize the value of the corporate entity, Neustar; their duty (as well as that of Neustar's managers) was owed not solely to Warburg, but to Neustar and *all* of its shareholders. *See In re Teleglobe Communications Corp.*, 493 F.3d 345, 367 (3d Cir. 2007) (applying Delaware law); *VFB*, 482 F.3d at 635 (same). Here, in sharp contrast, the duties of Telcordia's directors run to Ericsson alone. *See* pp. 31-32, *supra*. Further, the Commission acknowledged that "the [sole] beneficiary under the trust will be Ericsson." *Order* ¶ 182. While the Neustar trust had 25

beneficiaries, under the voting trust outlined in the Commission's order, Ericsson alone would beneficially own 100% of Telcordia.

Thus, far from supporting the Commission's action here, the Warburg precedent underscores that the safeguards imposed by the Commission on Ericsson's wholly owned subsidiary are plainly inadequate to cure a problem that the Commission made little effort to assess. The Commission's selection of Telcordia without a full evaluation of Ericsson's partiality was arbitrary and capricious, and the Commission's order should be vacated on that basis.

## III. THE COMMISSION VIOLATED THE ADMINISTRATIVE PROCEDURE ACT BY FAILING TO ENGAGE IN NOTICE-AND-COMMENT RULEMAKING

The selection of Telcordia as the next Administrator involved the exercise of the Commission's rulemaking authority and raised a host of policy issues that required rulemaking. As a result, the Commission was required to comply with the notice-and-comment procedures set forth in the Administrative Procedure Act. Because the Commission did not do so, *see Order* ¶ 18, its order was unlawful and should be vacated. *See, e.g., Heartland Regional Medical Center* v. *Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009).

### A. The Commission's Order Constituted An Exercise in Rulemaking

1.    When the Commission selected Telcordia as the next Administrator and addressed related matters in its order, it was exercising legislative

50

authority—and was therefore required to comply with the notice-and-comment procedures set forth in the Administrative Procedure Act. As this Court has explained, "when a statute defines a duty in terms of agency regulations, those regulations are considered legislative rules." *United States Telecom Ass'n* v. *FCC*, 400 F.3d 29, 38 (D.C. Cir. 2005). Here, the relevant statute requires the Commission, through "regulations," to "implement the requirements of" Section 251, including the designation of "one or more impartial entities to administer telecommunications numbering and to make such numbers available on an equitable basis" pursuant to subsection (e). 47 U.S.C. § 251(d)(1), (e)(1).

The Supreme Court already has recognized that "Section 251(e) . . . *requires* the Commission to exercise its rulemaking authority." *AT&T Corp.* v. *Iowa Utilities Board*, 525 U.S. 366, 383 n.9 (1999); *cf. United States Telecom*, 400 F.3d at 38-40 (holding that the Commission is required to implement Section 251(b)(2) through legislative rulemaking). The Commission designated Neustar's predecessor in interest in notice-and-comment rulemaking proceedings. *See also* Toll Free Service Access Codes, 65 Fed. Reg. 53,189 (Sept. 1, 2000) (to be codified at 47 C.F.R. pt. 52) (designation of Toll-Free Database Administrator); NANC Issues Recommendations Regarding the Implementation of Telephone Number Portability, 62 Fed. Reg. 25,157 (May 8, 1997) (to be codified at 47 C.F.R. ch. 1) (designation of Local Number

Portability Administrator); Administration of the North American Number-
ing Plan, 62 Fed. Reg. 55,179 (Oct. 23, 1997) (to be codified at 47 C.F.R. pt.
52) (designation of North American Numbering Plan Administrator).  When
it selected Telcordia, the Commission explicitly invoked its legislative author-
ity.  *See Order* ¶ 199 (citing 47 U.S.C. § 251(e) and also 47 U.S.C. § 303(r),
which grants general rulemaking authority to the Commission).  The Com-
mission also explicitly invoked its legislative authority when it adopted regu-
lations establishing neutrality requirements and addressed other policy mat-
ters involving numbering portability administration.  *See*, *e.g.*, *Second Report
and Order* ¶ 133.

      2.      The Commission's order repealed the Commission's prior selec-
tion of Lockheed (Neustar's predecessor in interest), which itself was the
product of notice-and-comment rulemaking, and adopted positions incon-
sistent with existing neutrality regulations that were established through no-
tice-and-comment rulemaking.  Agencies must "use the same procedures
when they amend or repeal a rule as they used to issue the rule in the first
instance."  *Perez* v. *Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1206 (2015).
"[I]f an agency adopts a new position *inconsistent with* an existing regula-
tion, or effects *a substantive change in* the regulation, notice and comment
are required."  *United States Telecom*, 400 F.3d at 35 (internal quotation
marks omitted).  As this Court has put it, "an amendment to a legislative rule

52

must itself be legislative." *Sprint Corp.* v. *FCC*, 315 F.3d 369, 374 (D.C. Cir. 2003).

Notably, not only did the Commission select Neustar's predecessor in interest as Administrator after a notice-and-comment proceeding; it codified that selection in a regulation that incorporated the Selection Working Group's recommendations (with specified exceptions). 47 C.F.R. § 52.26(a); *see American Mining Congress* v. *Mine Safety & Health Administration*, 995 F.2d 1106, 1109 (D.C. Cir. 1993) (noting that "an agency seems likely to have intended a rule to be legislative if it has the rule published in the Code of Federal Regulations"). Selecting a new Administrator is thus "inconsistent with"—and "effects a substantive change in"—that prior regulation. *United States Telecom*, 400 F.3d at 35.

The Commission's order also effectively alters its neutrality regulations. As discussed above, in selecting Telcordia, the Commission effectively repudiated the rules that the Administrator cannot be aligned with a particular segment of the telecommunications industry and cannot be the affiliate of a telecommunications network equipment manufacturer. *See* pp. 28-29, 35-41, *supra*. The Commission also rejected the requirement in its regulations that it consider the business relationships and activities of Telcordia's 100% owner in evaluating Telcordia's neutrality. *See* pp. 41-46, *supra*. If the Commission wanted to accommodate Telcordia by altering its neutrality re-

quirements, which are themselves set out in regulations, it was required to do so through the ordinary rulemaking process.

3.      The Commission's selection of a new Administrator required notice-and-comment rulemaking because it constituted a "statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy."  5 U.S.C. § 551(4).

To begin with, the selection of a new Administrator is of "general or particular applicability," because it affects the thousands of service providers—ranging from major wireless providers to local telephone companies—that rely on (and pay for) the Administrator's services in order to provide number portability, as well as the millions of customers served by those companies.  The selection of Telcordia implicated numerous issues of public importance addressed in the Commission's order, including (a) transition costs and risks, especially for small carriers; (b) public-safety and law-enforcement issues arising from a transition; (c) national-security issues; (d) cybersecurity concerns; and (e) issues concerning Telcordia's neutrality.  *See*, *e.g.*, *Order* ¶¶ 82-83, 95-133, 146-188.  The Commission acknowledged the importance of these issues.  *See*, *e.g.*, *id.* ¶¶ 82-83, 102, 118, 122, 157-158, 160-161.  The selection of a new Administrator is also of "future effect," because it does not address the legal effect of past conduct but instead establishes forward-looking rules to govern future behavior.

54

Further, the selection of Telcordia is "designed to implement, interpret, or prescribe law or policy." As discussed above, the Commission's selection of a new Administrator raised several significant policy questions that the Commission addressed in its order. And it "affects the rights of broad classes of unspecified individuals." *City of Arlington* v. *FCC*, 668 F.3d 229, 242 (5th Cir. 2012), *aff'd*, 133 S. Ct. 1863 (2013). The Commission's designation has implications, for example, with respect to the costs that local exchange carriers must bear to comply with their duty to provide number portability. *See* 47 U.S.C. § 251(b)(2). It affects the thousands of service providers that must provide, and pay for, number portability and the millions of subscribers who ultimately bear those costs. The Commission's selection also affects "the functioning of the Nation's critical communications infrastructure, public safety, and the national security." *Order* ¶ 82. And any alteration of the Commission's neutrality requirements affects the "public interest," because those requirements affect providers and consumers alike. *First Report and Order* ¶ 92.

The future effects of the Commission's order distinguish it from an adjudication, which has "past legal consequences" as well as future ones. *Bowen* v. *Georgetown University Hospital*, 488 U.S. 204, 216 (1988) (Scalia, J., concurring). As the Commission conceded in its order, *see Order* ¶ 20, the selection of a new Administrator has "*only* future effect." *Verizon* v. *FCC*, 770

F.3d 961, 967 (D.C. Cir. 2014). The same is true for the policy determinations made by the Commission in connection with the selection of Telcordia. While the Commission has contended that nothing "requires all adjudications to have retrospective effect," *Order* ¶ 20, that is plainly incorrect: "an adjudication *must* have retroactive effect, or else it would be considered a rulemaking." *Catholic Health Initiatives Iowa Corp.* v. *Sebelius*, 718 F.3d 914, 921-922 (D.C. Cir. 2013).

### B. The Commission's Failure To Engage In Notice-And-Comment Rulemaking Was Highly Prejudicial

Because the Commission's failure to go through the notice-and-comment rulemaking process was not harmless, its order should be vacated.

1. The public notice announcing the recommendation of Telcordia—which was not published in the Federal Register—failed to seek comment on many significant policy issues implicated by a potential change in Administrator, including changes in the nature of the services that the portability system will offer; the implications of the selection of Telcordia for public safety, law enforcement, and national security; and issues concerning foreign ownership of the Administrator. Instead, the public notice merely provided a one-sentence description of the topics covered in the Numbering Council's recommendation. *See Commission Seeks Comment on the North American Numbering Council Recommendation of a Vendor To Serve As Local Number Portability Administrator*, 29 FCC Rcd. 6013 (2014). As a result, the

public had an inadequate opportunity to comment on the significant policy implications of a transition to Telcordia.

In addition, the Commission's order adopts numerous substantive requirements that were never mentioned in the public notice and that commenting parties therefore had no opportunity to address. For example, the public notice gave no warning that the Commission was considering altering its neutrality requirements in order to select Telcordia, nor did it describe the "safeguards" that would be put in place to guard against influence from Telcordia's parent company, Ericsson. Because the Commission's neutrality determination rests on a misunderstanding of corporate law, as discussed above, additional comment on that crucial issue could have made a difference. Thus, "the effect of the Commission's procedural errors is uncertain, and the Commission's 'utter failure' to afford proper notice and comment was not harmless." *Sprint*, 315 F.3d at 377 (citation omitted); *accord Chamber of Commerce* v. *SEC*, 443 F.3d 890, 906 (D.C. Cir. 2006).

2.    The Commission's failure to engage in notice-and-comment rulemaking prejudiced Neustar in the bidding process. Neustar "detrimentally relied on the established" neutrality criteria when it bid for the contract. *Consolidated Edison Co.* v. *FERC*, 315 F.3d 316, 323 (D.C. Cir. 2003). Neutrality is a significant factor in the cost of bidding, because complying with the Commission's neutrality requirements entails costs in the form of for-

gone business and investment opportunities in which an impartial Administrator cannot participate. *See* Letter from Aaron M. Panner, Counsel to Neustar, to Marlene H. Dortch, Secretary, Commission, at 3 (Oct. 9, 2012); Letter from Aaron M. Panner, Counsel to Neustar, to Marlene H. Dortch, Secretary, Commission, at 2 (Sept. 25, 2012). Neustar never had the opportunity to tailor its bid to the new requirements that the Commission ultimately applied to Telcordia.

3. The Commission's improper treatment of the selection of the Administrator as an adjudication, rather than a rulemaking, allowed it to evade the requirements of the Regulatory Flexibility Act. That statute protects the interests of small businesses by requiring an agency to follow certain procedures when engaging in rulemaking, including preparing a "regulatory flexibility analysis" that assesses the impact of any proposed or final rule on smaller entities. *See* 5 U.S.C. §§ 603-604.

In this case, five associations representing more than a thousand smaller carriers urged the Commission to conduct a regulatory flexibility analysis because they feared that the high costs of the transition from Neustar to Telcordia would fall disproportionately on them. *See* Letter of NTCA–The Rural Broadband Association et al. to Marlene Dortch, Secretary, Commission, at 1-2 (Mar. 3, 2015); Letter of James C. Falvey, Counsel to the LNP Alliance, to Marlene H. Dortch, Secretary, Commission, at 4-8

58

(Jan. 12, 2015).  But the Commission refused to do so, based on its belief that notice-and-comment rulemaking was unnecessary.  *See Order* ¶ 30 n.106.  If the Commission had conducted a rulemaking as required, it would have had to provide a meaningful assessment of how the transition would affect the many small carriers that rely on and pay for the Administrator's services.

Because the Commission's failure to engage in notice-and-comment rulemaking was prejudicial to consumers, carriers, and Neustar, this Court should vacate the Commission's order.

## IV.    THE COMMISSION'S EVALUATION OF THE COMPETING PROPOSALS WAS ARBITRARY AND CAPRICIOUS

Finally, the Commission's selection of Telcordia was arbitrary and capricious, in violation of the Administrative Procedure Act, because the Commission failed reasonably to evaluate the overall costs of the competing proposals.  The Commission committed two significant, and independent, errors.  *First*, the Commission's evaluation of costs was based on an unsupported assumption concerning the duration of the transition from Neustar to Telcordia that is affirmatively contradicted by the record.  If the Commission had not made that groundless assumption, it would have found that Telcordia's proposal offered no cost advantage over Neustar's.  *Second*, without justification, the Commission refused to consider Neustar's best offer.  If it had done so, it would have found that Neustar's best offer was superior to Telcordia's bid.

59

### A.    The Commission's Selection Was Based On Its Assessment Of The Costs Of The Two Bids

The Commission concluded that "both bidders are qualified to serve as [Administrator]." *Order* ¶ 65; *see id.* ¶¶ 65-133.  Although Neustar contended that its bid was qualitatively superior to Telcordia's, the Commission did not find that one bid was preferable on technical or managerial grounds.  *See id.* As a result, the Commission selected Telcordia based on its assessment of the costs of the two bids.  *See id.* ¶¶ 134-159.  As the Commission acknowledged, *see id.* ¶ 153, the evaluation of cost has two basic components:  first, the price of the two bids, and second, the transition costs associated with switching to Telcordia.

To be sure, there was a substantial difference in price between the two bids the NAPM subcommittee considered.  **[BEGIN HIGHLY CONFIDENTIAL INFORMATION]** ████████████████████████ ████████████████████████ ██████████   ████████████   **[END HIGHLY CONFIDENTIAL INFORMATION]**

Transition costs, however, weighed heavily against Telcordia's bid.  Those transition costs included both "direct service provider expenses such as third-party tests, training, and process development" and "industry costs to manage the transition and develop a new NPAC functionality."  *Order* ¶ 151.  **[BEGIN HIGHLY CONFIDENTIAL INFORMATION]** ███

60

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

███████████████████     ██    **[END HIGHLY CONFIDENTIAL INFOR-MATION]** But that conclusion cannot be squared with the record, which demonstrates that Neustar, not Telcordia, was the lower-cost option.

> **B.** **The Commission's Assessment Of Costs Was Based On An Unsupported And Erroneous Assumption About Transition Costs**

The Commission's evaluation of costs was based on an unsupported and erroneous assumption: **[BEGIN HIGHLY CONFIDENTIAL IN-FORMATION]** ███████████████████████████████

█████████████████████████████████████████

████████████████████████████ **[END HIGHLY CONFIDEN-TIAL INFORMATION]**

That assumption represents a classic case of an agency "offer[ing] an explanation for its decision that runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43. Nothing in the record before the Commission supports that assumption. On the contrary, the record establishes that the transition would take at least two and a half years. The NAPM's own estimate, prepared in 2009, was that any transition would take at least 33 months from selection to implementation. *See* Letter from Aaron M. Panner, Counsel to Neustar, to Marlene H. Dortch, Secretary, Commission, at 3 (Feb. 20, 2015). Consistent with that figure, an expert analysis submitted by Neustar estimated that, in the best case, implementation of Telcordia's proposed system would take at least 30 to 36 months. *See* Letter from Thomas L. McGovern, III, Counsel to Neustar, to Marlene H. Dortch, Secretary, Commission (Jan. 28, 2015) (attaching analysis); *Order* ¶ 155 n.547 (citing Neustar estimate). Tellingly, Telcordia's own consultant declined to put any particular timeline on the transition, instead noting only that "schedule compression . . . is likely not achievable without incurring additional risks that may require further consideration and mitigation." Reply Comments of Telcordia Technologies, Inc., Ex. C (Report of Deloitte Consulting, LLP) at 2 (Aug. 22, 2014).

**[BEGIN HIGHLY CONFIDENTIAL INFORMATION]** ███████

████████████████████████████████████████████████████████

62

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████ **[END HIGHLY
CONFIDENTIAL INFORMATION]** The Commission's faulty assumption
undermined the entire rationale for its selection of Telcordia.

### C.    The Commission Provided No Reasoned Explanation For Refusing To Consider Neustar's Best Offer

The Commission's evaluation of costs was flawed for the additional reason that the Commission refused to consider Neustar's best offer. **[BEGIN
HIGHLY CONFIDENTIAL INFORMATION]** ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████  ████████████████ **[END
HIGHLY CONFIDENTIAL INFORMATION]** The Commission acted improperly when it refused to consider that offer.

The Commission offered only one reason for disregarding Neustar's best offer: the NAPM subcommittee decided not to entertain additional proposals. *See Order* ¶ 145. But that does not explain why the Commission, which purported to "evaluat[e] the bids independent of" the work of its de-

63

signees, *id.* ¶ 65, did not *itself* consider Neustar's best offer. While the Commission stated in its order that it "was not presented with details about Neustar's second [best and final offer]" until shortly before the order was released, *id.* ¶ 145, that is incorrect. **[BEGIN HIGHLY CONFIDENTIAL INFORMATION]** ██████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

██████████████     **[END HIGHLY CONFIDENTIAL INFORMATION]**

What is more, the failure of the NAPM subcommittee (and hence the Selection Working Group and the Numbering Council) to consider Neustar's best offer was itself the result of arbitrary and capricious—and, indeed, improper—action by the Commission. **[BEGIN HIGHLY CONFIDENTIAL INFORMATION]** ██████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

64

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████ **[END HIGHLY CONFIDENTIAL INFOR-**

**MATION]**

As the Commission itself acknowledged in its order, however, "the se-
lection of the [Administrator] is not governed by [federal procurement law]."
*Order* ¶ 185. Moreover, sound procurement practices actually favored the
solicitation of further rounds of proposals. The Federal Acquisition Regula-
tions provide that "[t]he primary objective of discussions"—the final phase of
which is the solicitation of final proposal revisions—"is to maximize the Gov-
ernment's ability to obtain best value." 48 C.F.R. § 15.306(d)(2). That is un-
surprising, because "[t]he public's interest is clearly served when suppliers
engage in fair and robust competition." *SAI Industries Corp.* v. *United
States*, 60 Fed. Cl. 731, 747 (2004). As long as "the discussions are not con-

ducted in a fashion that favors one offeror over another," further rounds of bidding promote that objective. *ManTech Telecommunications & Information Systems Corp.* v. *United States*, 49 Fed. Cl. 57, 77 (2001).

If the Commission had considered Neustar's best offer, it would have concluded that the offer was superior to Telcordia's bid, thereby serving the public interest. The Commission's failure to consider that offer was improper. That error, like the Commission's many others, warrants vacatur of the Commission's order.

## CONCLUSION

The order of the Federal Communications Commission should be vacated.

Respectfully submitted,

s/ Kannon K. Shanmugam

| | |
|---|---|
| TYRONE BROWN | KANNON K. SHANMUGAM |
| ANDREW G. MCBRIDE | MARCIE R. ZIEGLER |
| THOMAS J. NAVIN | JAMES GILLENWATER |
| BRETT A. SHUMATE | AMY E. MURPHY |
| WILEY REIN LLP | WILLIAMS & CONNOLLY LLP |
| *1776 K Street, N.W.* | *725 Twelfth Street, N.W.* |
| *Washington, DC 20006* | *Washington, DC 20005* |
| *(202) 719-7000* | *(202) 434-5000* |
| | *kshanmugam@wc.com* |

SEPTEMBER 21, 2015

66

# STATUTORY AND REGULATORY ADDENDUM

## TABLE OF CONTENTS

Page

47 U.S.C. § 251(e) ................................................................A-1

47 C.F.R. § 52.12 ..................................................................A-1

47 C.F.R. § 52.21(k) .............................................................A-5

47 C.F.R. § 52.26 ..................................................................A-5

1997 Local Number Portability Administration Selection Working
  Group Report § 4.2.2 ........................................................A-7

1997 Local Number Portability Administration Selection Working
  Group Report §§ 6.4.4 & 6.4.5 .........................................A-8

1997 Local Number Portability Administration Selection Working
  Group Report § 6.5.4 ........................................................A-9

1997 Local Number Portability Administration Selection Working
  Group Report § 6.7.2 ........................................................A-9

**47 U.S.C. § 251(e)**

Numbering administration

(1) Commission authority and jurisdiction

The Commission shall create or designate one or more impartial entities to administer telecommunications numbering and to make such numbers available on an equitable basis. The Commission shall have exclusive jurisdiction over those portions of the North American Numbering Plan that pertain to the United States. Nothing in this paragraph shall preclude the Commission from delegating to State commissions or other entities all or any portion of such jurisdiction.

(2) Costs

The cost of establishing telecommunications numbering administration arrangements and number portability shall be borne by all telecommunications carriers on a competitively neutral basis as determined by the Commission.

(3) Universal emergency telephone number

The Commission and any agency or entity to which the Commission has delegated authority under this subsection shall designate 9-1-1 as the universal emergency telephone number within the United States for reporting an emergency to appropriate authorities and requesting assistance. The designation shall apply to both wireline and wireless telephone service. In making the designation, the Commission (and any such agency or entity) shall provide appropriate transition periods for areas in which 9-1-1 is not in use as an emergency telephone number on October 26, 1999.

*     *     *     *     *

**47 C.F.R. § 52.12**

The North American Numbering Plan Administrator ("NANPA") and the associated "B & C Agent" will conduct their respective operations in accordance with this section. The NANPA and the B & C Agent will conduct their

A-1

respective operations with oversight from the Federal Communications Commission (the "Commission") and with recommendations from the North American Numbering Council ("NANC").

(a)(1) Neutrality. The NANPA and the B & C Agent shall be non-governmental entities that are impartial and not aligned with any particular telecommunication industry segment. Accordingly, while conducting their respective operations under this section, the NANPA and B & C Agent shall ensure that they comply with the following neutrality criteria:

(i) The NANPA and B & C Agent may not be an affiliate of any telecommunications service provider(s) as defined in the Telecommunications Act of 1996, or an affiliate of any interconnected VoIP provider as that term is defined in § 52.21(h). "Affiliate" is a person who controls, is controlled by, or is under the direct or indirect common control with another person. A person shall be deemed to control another if such person possesses, directly or indirectly—

(A) An equity interest by stock, partnership (general or limited) interest, joint venture participation, or member interest in the other person ten (10%) percent or more of the total outstanding equity interests in the other person, or

(B) The power to vote ten (10%) percent or more of the securities (by stock, partnership (general or limited) interest, joint venture participation, or member interest) having ordinary voting power for the election of directors, general partner, or management of such other person, or

(C) The power to direct or cause the direction of the management and policies of such other person, whether through the ownership of or right to vote voting rights attributable to the stock, partnership (general or limited) interest, joint venture participation, or member interest) of such other person, by contract (including but not limited to stockholder agreement, partnership (general or limited) agreement, joint venture agreement, or operating agreement), or otherwise;

(ii) The NANPA and B & C Agent, and any affiliate thereof, may not issue a majority of its debt to, nor may it derive a majority of its revenues from, any

telecommunications service provider. "Majority" shall mean greater than 50 percent, and "debt" shall mean stocks, bonds, securities, notes, loans or any other instrument of indebtedness; and

(iii) Notwithstanding the neutrality criteria set forth in paragraphs (a)(1) (i) and (ii) of this section, the NANPA and B & C Agent may be determined to be or not to be subject to undue influence by parties with a vested interest in the outcome of numbering administration and activities. NANC may conduct an evaluation to determine whether the NANPA and B & C Agent meet the undue influence criterion.

(2) Any subcontractor that performs—

(i) NANP administration and central office code administration, or

(ii) Billing and Collection functions, for the NANPA or for the B & C Agent must also meet the neutrality criteria described in paragraph (a)(1).

(b) Term of administration. The NANPA shall provide numbering administration, including central office code administration, for the United States portion of the North American Numbering Plan ("NANP") for an initial period of five (5) years. At any time prior to the termination of the initial or subsequent term of administration, such term may be renewed for up to five (5) years with the approval of the Commission and the agreement of the NANPA. The B & C Agent shall provide billing and collection functions for an initial period of five (5) years. At any time prior to the termination of the initial or subsequent term of administration, such term may be renewed for up to five (5) years with the approval of the Commission and the agreement of the B & C Agent.

(c) Changes to regulations, rules, guidelines or directives. In the event that regulatory authorities or industry groups (including, for example, the Industry Numbering Committee—INC, or its successor) issue rules, requirements, guidelines or policy directives which may affect the functions performed by the NANPA and the B & C Agent, the NANPA and the B & C Agent shall, within 10 business days from the date of official notice of such rules, requirements, guidelines or policy directives, assess the impact on its operations and advise the Commission of any changes required. NANPA and

A-3

the B & C Agent shall provide written explanation why such changes are required. To the extent the Commission deems such changes are necessary, the Commission will recommend to the NANP member countries appropriate cost recovery adjustments, if necessary.

(d) Performance review process. NANPA and the B & C Agent shall develop and implement an internal, documented performance monitoring mechanism and shall provide such performance review on request of the Commission on at least an annual basis. The annual assessment process will not preclude telecommunications industry participants from identifying performance problems to the NANPA, the B & C Agent and the NANC as they occur, and from seeking expeditious resolution. If performance problems are identified by a telecommunications industry participant, the NANC, B & C Agent or NANPA shall investigate and report within 10 business days of notice to the participant of corrective action, if any, taken or to be taken. The NANPA, B & C Agent or NANC (as appropriate) shall be permitted reasonable time to take corrective action, including the necessity of obtaining the required consent of the Commission.

(e) Termination. If the Commission determines at any time that the NANPA or the B & C Agent fails to comply with the neutrality criteria set forth in paragraph (a) of this section or substantially or materially defaults in the performance of its obligations, the Commission shall advise immediately the NANPA or the B & C Agent of said failure or default, request immediate corrective action, and permit the NANPA or B & C Agent reasonable time to correct such failure or default. If the NANPA or B & C Agent is unwilling or unable to take corrective action, the Commission may, in a manner consistent with the requirements of the Administrative Procedure Act and the Communications Act of 1934, as amended, take any action that it deems appropriate, including termination of the NANPA's or B & C Agent's term of administration.

(f) Required and optional enterprise services. Enterprise Services, which are services beyond those described in § 52.13 that may be provided by the new NANPA for specified fees, may be offered with prior approval of the Commission.

A-4

(1) Required Enterprise Services. At the request of a code holder, the NANPA shall, in accordance with industry standards and for reasonable fees, enter certain routing and rating information, into the industry-approved database(s) for dissemination of such information. This task shall include reviewing the information and assisting in its preparation.

(2) Optional Enterprise Services. The NANPA may, subject to prior approval and for reasonable fees, offer "Optional Enterprise Services" which are any services not described elsewhere in this section.

(3) Annual report. NANPA shall identify and record all direct costs associated with providing Enterprise Services separately from the costs associated with the non-enterprise NANPA functions. The NANPA shall submit an annual report to the NANC summarizing the revenues and costs for providing each Enterprise Service. NANPA shall be audited by an independent auditor after the first year of operations and every two years thereafter, and submit the report to the Commission for appropriate review and action.

*     *     *     *     *

**47 C.F.R. § 52.21(k)**

The term local number portability administrator (LNPA) means an independent, non-governmental entity, not aligned with any particular telecommunications industry segment, whose duties are determined by the NANC.

*     *     *     *     *

**47 C.F.R. § 52.26**

(a) Local number portability administration shall comply with the recommendations of the North American Numbering Council (NANC) as set forth in the report to the Commission prepared by the NANC's Local Number Portability Administration Selection Working Group, dated April 25, 1997 (Working Group Report) and its appendices, which are incorporated by reference pursuant to 5 U.S.C. 552(a) and 1 CFR part 51. Except that: Section 7.10 of Appendix D and the following portions of Appendix E: Section 7, Is-

A-5

sue Statement I of Appendix A, and Appendix B in the Working Group Report are not incorporated herein.

(b) In addition to the requirements set forth in the Working Group Report, the following requirements are established:

(1) If a telecommunications carrier transmits a telephone call to a local exchange carrier's switch that contains any ported numbers, and the telecommunications carrier has failed to perform a database query to determine if the telephone number has been ported to another local exchange carrier, the local exchange carrier may block the unqueried call only if performing the database query is likely to impair network reliability;

(2) The regional limited liability companies (LLCs), already established by telecommunications carriers in each of the original Bell Operating Company regions, shall manage and oversee the local number portability administrators, subject to review by the NANC, but only on an interim basis, until the conclusion of a rulemaking to examine the issue of local number portability administrator oversight and management and the question of whether the LLCs should continue to act in this capacity; and

(3) The NANC shall provide ongoing oversight of number portability administration, including oversight of the regional LLCs, subject to Commission review. Parties shall attempt to resolve issues regarding number portability deployment among themselves and, if necessary, under the auspices of the NANC. If any party objects to the NANC's proposed resolution, the NANC shall issue a written report summarizing the positions of the parties and the basis for the recommendation adopted by the NANC. The NANC Chair shall submit its proposed resolution of the disputed issue to the Chief of the Wireline Competition Bureau as a recommendation for Commission review. The Chief of the Wireline Competition Bureau will place the NANC's proposed resolution on public notice. Recommendations adopted by the NANC and forwarded to the Bureau may be implemented by the parties pending review of the recommendation. Within 90 days of the conclusion of the comment cycle, the Chief of the Wireline Competition Bureau may issue an order adopting, modifying, or rejecting the recommendation. If the Chief does not act within 90 days of the conclusion of the comment cycle, the recommendation will be deemed to have been adopted by the Bureau.

A-6

(c) The Director of the Federal Register approves this incorporation by reference in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. Copies of the Working Group Report and its appendices can be obtained from the Commission's contract copier, Best Copy and Printing, Inc. (BCPI), Portals II, 445 12th Street, SW, Room CY–B402, Washington, DC 20554, (202) 488–5300, or via e-mail at fcc@bcpiweb.com, and can be inspected during normal business hours at the following locations: Reference Information Center, 445 12th Street, SW., Room CY—A257, Washington, DC 20554 or at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call (202) 741–6030, or go to: http://www.archives.gov/federal-register/cfr/ibr-locations.html. The Working Group Report and its appendices are also available on the Internet at http://www.fcc.gov/wcb/cpd/Nanc/lnpastuf.html.

*     *     *     *     *

## 1997 Local Number Portability Administration Selection Working Group Report § 4.2.2

4.2.2 Service Providers in each region first consulted with a broad community of groups interested in LNP, including state regulatory commissions, providers of database services and carriers of all types, to develop request for proposals (RFPs). The RFPs were then widely distributed to firms that could provide NPAC SMS services (Vendors). The Service Providers received and answered RFP-related questions raised by Vendors. A crucial element of the RFPs was the imposition of a neutrality requirement for all Vendors. For example, Section 1.3.4 of the Mid-Atlantic Region's RFP provided:

A. In order to prevent a real conflict of interest, the Primary Vendor/System Administrator must be a neutral third party that has no financial or market interest in providing local exchange services within the United States.

B. To prevent such a conflict of interest, the Primary Vendor/System Administrator "NPAC" function *will not* be awarded to:

1.) any entity with a *direct material financial interest* in the *United States portion* of the North American Numbering Plan (NANP), and number as-

A-7

signments pursuant to the Plan, including (but not limited to) telecommunications carriers;

2.) any entity with a *direct material financial interest* in manufacturing telecommunications network equipment;

3.) any entity affiliated in other than a deminimus way in any entity described in 1.) or 2.) above, and;

4.) any entity involved in a contractual relationship or other arrangement that would impair the entity's ability to administer numbers fairly under the NANP and in accordance with the procedural delivery schedule set forth in the RFP.

Identical or substantially similar neutrality requirements appeared in the other six (6) RFPs. The Vendors ultimately selected in the seven (7) regions, Lockheed Martin and Perot Systems, have thus established their neutrality following a review and approval screening process by seven (7) different groups of Service Providers conducting their own independent investigations in their seven (7) respective regions.

*      *      *      *      *

## 1997 Local Number Portability Administration Selection Working Group Report §§ 6.4.4 & 6.4.5

6.4.4 Recommendation

The LNPA Selection Working Group recommends adoption of the process used to make LNPA vendor selections.

6.4.5 Justification

The process used for LNPA vendor selection is extensively discussed in Section 4 above.

*      *      *      *      *

A-8

**1997 Local Number Portability Administration Selection Working Group Report § 6.5.4**

6.5.4 Recommendation

The LNPA Selection Working Group recommends adoption of the duties outlined in the Architecture & Administrative Plan for LNP contained in Appendix D, and those detailed requirements defined in the FRS and IIS documents.

*     *     *     *     *

**1997 Local Number Portability Administration Selection Working Group Report § 6.7.2**

6.7.2 Report Reference

Sections 7 through 11 of the Task Force report contained in Appendix E describe in detail the recommendations made by that team.

A-9

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Kannon K. Shanmugam, counsel for petitioner and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), that the attached Brief of Petitioner Neustar, Inc., is proportionately spaced, has a typeface of 14 points or more, and contains 13,984 words.

                                         <u>s/ Kannon K. Shanmugam</u>
                                         KANNON K. SHANMUGAM

SEPTEMBER 21, 2015

## CERTIFICATE OF SERVICE

I, Kannon K. Shanmugam, counsel for petitioner and a member of the bar of this Court, certify that, on September 21, 2015, a public copy of the attached Brief of Petitioner Neustar, Inc., was filed with the Clerk through the Court's electronic filing system. The brief was delivered to the Clerk to be filed under seal on the same day. I further certify that all parties required to be served have been served the public copy of the brief through the Court's electronic filing system and will be served two copies of the brief under seal by third-party commercial carrier for delivery within 3 days, pursuant to Circuit Rules 25(f), 31(b), and 47.1(d)(2) and Federal Rule of Appellate Procedure 25(c)(1).

   s/ Kannon K. Shanmugam   

KANNON K. SHANMUGAM
